[No. 8514–0–I. Division One. September 28, 1981.]

THE STATE OF WASHINGTON, *Respondent*, v. DANIEL
W. HOLLAND, *Appellant*.

*William Jaquette* of *Eastside Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Andrew Hamilton, Deputy,* for respondent.

Callow, J.—Daniel Holland appeals from a juvenile

court order declining jurisdiction and a superior court jury conviction of murder in the second degree and rape in the second degree.

On August 14, 1979, the body of 11–year–old Ruth Spencer was found by her brother in a shallow grave near the family's home. She had been shot through the head with a .22 caliber rifle and there was evidence of sexual intercourse. The defendant, Ruth's 16–year–old cousin, was living with the Spencers at the time and admitted to them that he was to blame. The police were called and Holland was taken into custody, where he gave a statement concerning the matter.

Holland was arraigned in juvenile court and charged with murder in the first degree, rape in the first degree, and statutory rape in the second degree. A juvenile court probation counselor was assigned as Holland's caseworker. Pursuant to RCW 13.40.110(1)(a),[1] the State filed a motion to decline juvenile court jurisdiction and remand the case for criminal prosecution as an adult. The juvenile court caseworker was ordered by the juvenile court to arrange for psychological or psychiatric evaluations to aid the court in its determination whether to decline jurisdiction. Evaluations were conducted by Drs. Gordon Carlson, James McDermott, and Irwin Dreiblatt, all of whom met with Holland at least once before preparing their reports. Holland's attorney had advised him to speak freely with the professionals, which, to varying degrees, Holland did. He told Dr. Dreiblatt that he pointed the gun intentionally at Ruth, but that the shooting was unintended. Dr. Carlson and Dr. McDermott were told that the sexual intercourse

---

[1]RCW 13.40.110(1)(a) provides:

"(1) The prosecutor, respondent, or the court on its own motion may, before a hearing on the information on its merits, file a motion requesting the court to transfer the respondent for adult criminal prosecution and the matter shall be set for a hearing on the question of declining jurisdiction. Unless waived by the court, the parties, and their counsel, a decline hearing shall be held where:

"(a) The respondent is sixteen or seventeen years of age and the information alleges a class A felony or an attempt to commit a class A felony . . ."

was consensual and that the shooting was accidental when he tripped over a box.

At the decline hearing, testimony was presented establishing that, if Holland remained in the juvenile justice system, he could be released from custody in as little as 19½ months, and in no event would he be confined beyond his 21st birthday. Were Holland prosecuted as an adult, he would be eligible for parole no sooner than 13 years and 4 months after sentencing, when he would be about 30 years old. There was a general consensus among those testifying that the juvenile justice system would afford Holland superior rehabilitative services than would the adult system.

The three mental health professionals retained to examine Holland rendered their professional evaluations, testifying as to his mental health, possible danger to society, potential for treatment, and the comparative availability of treatment facilities in the juvenile and adult corrections programs. Their evaluations can generally be summarized by the conclusions of Dr. Dreiblatt:

A. I think without question Dan is an extremely immature, intellectually limited youngster, who comes from a very erratic and deprived environment. As has been mentioned before, a juvenile in every sense of the word, and in that sense, I believe should be dealt with in the juvenile system and would require that kind of intervention and treatment to have any hopes of profiting in the years to come and with any success. I think, as a very limited juvenile, would [fare] very badly in the adult system, that that would be a destructive influence upon him, that he would likely not receive constructive assistance, so in that sense I strongly feel that his needs are such, that he would best be treated in the juvenile system. The other side of the dilemma is that, given the violent nature of the offense, his inability at this point to try to confront that in a way that would give us some better indication of the nature of that act and how he may deal with it in the years to come, and his limited capabilities make me very concerned about his—about the safety of this youngster being in the community without any restrictions four years hence.

Q. Are you able to give this Court any kind of assurance that he will be safe? That he will be safe to be at large in the community in four years?

A. I cannot.

When the State moved to admit the written reports of the three doctors, counsel for Holland objected to their admissibility in the juvenile's legal file. The juvenile court sustained the objection because the reports were duplicated in the social file, and then ordered the exhibits sealed.[2] Holland's attorney reiterated that the basis for his motion was that much of the testimony relevant to the decline hearing would not be admissible during the adult trial.

In its oral decision, the juvenile court declined jurisdiction and transferred the matter to the adult court.[3]

---

[2]A juvenile's criminal records are statutorily assigned to one of two files: (1) the "official juvenile court file," consisting of the petition or information, motion, memorandums, briefs, findings of the court, and court orders; and (2) the "social file," composed of the records and reports of the probation counselor. RCW 13.50.010(1)(b) and (c).

[3]The judge concluded in part:

"THE COURT: I have reached a decision. I wish I had some additional time to fashion adequate language to express it, but that wouldn't really gain us anything, and therefore I will just express it at this time. It's been suggested by both the lawyer for Dan as well as counsel for the State that virtually all sound reason points to their respective positions. It seems to me that the reason why this decision is acknowledged by everyone to be such a difficult one and which I find it such, is that there is, in fact, strong reason to go either way. With that fact, with my view that I am left with too many unanswered questions about Dan and the prognosis likelihood of future difficulties, it is my decision that the Petition to Decline jurisdiction will be granted.

"The length of period with inadequate parenting, the depth and nature of the problems suggested, the testimony of the professionals concerning their inability to make, with any confidence, the kind of diagnosis which would assist with predictability, makes me reach this decision which I hope will, in the long run, be a grant of the greatest flexibility. It's interesting that we have had one professional who has a long-time solid reputation as a member of the Department of Social & Health Services and another who has been a long-time competent member of our Legislature, both intimating that we would be a lot better off with more flexibility than either seems to think is available for Dan. I hope that each of them will double their efforts in the respective arenas and assist with others to achieve the kind of flexibility which everyone wants. That might be argued to be a pipe dream, but we have some time with Dan.

"There are a number of considerations which affect him in the community. I

RCW 13.40.110(3) requires that the juvenile court enter written findings of fact supporting its decision. The written findings in this case consisted merely of a standardized form upon which the court checked off those reasons it found to support its conclusion. Holland had previously stipulated to the sufficiency of the evidence as to all counts charged in the information, and this box was checked. The only other finding marked by the court was that "[t]he protection of the community requires a decline due to the seriousness of the alleged offense(s), which was/were committed in an aggressive, violent, premediated [*sic*] or willful manner."

Prior to trial in superior court, the statement Holland gave to police the evening of the incident was suppressed. The State dismissed count 3, statutory rape in the second degree. Holland made a motion in limine to exclude all inculpatory statements made to Dr. Dreiblatt. The trial

---

really respect [the juvenile court caseworker] expressed anguish. I have known him well enough through the Court and respect his work to have understood his feelings as vividly from my reading his report as I did from his expression here in Court. The irony, I think, or one irony, is that we have made decisions that seem now so binding on a young person when the age of 18 is reached. . . . But regardless of that kind of history or source of the legislation under which we now operate, I think we all recognize that nothing magic happens when each of us turns 18, 21 or any other time, and that when it comes to the kind of concern for the care of any person in the system, whether he be 15 or 18 or 23, we ought to approach it, not simply on the basis of chronological age. I don't mean to suggest that that is the only criteria which the State uses—I don't think that's so, and I would agree with Dr. Johns' statement that there are some opportunities in the adult system for the kind of treatment that makes some sense, and I am not going to start ticking off my understanding of where those lie. But I think they are real.

"I think there is also some discretion somewhat broader than has been indicated as to how long Dan is going to be in the Division of Institutions—whether it be in the juvenile or the adult system. But there is less discretion, I think, with the juvenile system. So none of us is going to go home very comfortable this evening, and most assuredly Dan has the toughest spot to be in, and I wish him well and hope that a system can be shaped in a way not only for Dan, but for those to come and for those in the system, that we can do a better job than we have heard testified to. But I think the decision which I have expressed is the one which ought to be made today under the evidence which has been presented, and I will sign the Order to that effect indicating the finding that the charge is sufficient to be considered by a jury in such a case, and that at this stage the protection of the community requires the decline."

court reserved ruling on the motion until the issue arose at trial.

In his opening statement to the jury, counsel for Holland made three separate references to his intention to call all three doctors to testify as to Holland's emotional problems and lack of maturity. In its case in chief, the State did not call the doctors or refer to their reports. After the State rested, Holland was called to testify on his own behalf and recount his version of the incident. On cross–examination, the State extensively questioned Holland, over his objection, about his earlier statements to the doctors. The State also introduced a document, entitled "My Thoughts," which was an inculpatory statement Holland made, under Dr. Dreiblatt's direction, concerning the incident. Holland also called Drs. McDermott and Carlson to the stand. In rebuttal, the State called Dr. Dreiblatt to illustrate inconsistencies in Holland's testimony and underscore that Holland did not assert to Dreiblatt that the shooting was accidental. Unlike Drs. Carlson and McDermott, Dr. Dreiblatt was never questioned about his professional evaluation of Holland's mental health or emotional maturity. In its cross–examination of Holland, the State elicited an acknowledgment that more than 2 weeks elapsed after the shooting before Holland claimed the incident was accidental. The State noted this in its closing argument to the jury.

The jury convicted Holland of murder in the second degree and rape in the second degree. The trial court imposed consecutive prison terms of 20 years for the murder and 10 years for the rape.

## I

■■ Holland first challenges the juvenile court's decision to decline jurisdiction, contending that the record made by the court and its written findings of fact do not satisfy the requirements of due process. RCW 13.40.110(2) and (3) provide:

(2) The court after a decline hearing may order the case transferred for adult criminal prosecution upon a

finding that the declination would be in the best interest of the juvenile or the public. The court shall consider the relevant reports, facts, opinions, and arguments presented by the parties and their counsel.

(3) When the respondent is transferred for criminal prosecution or retained for prosecution in juvenile court, the court shall set forth in writing its finding which shall be supported by relevant facts and opinions produced at the hearing.

The juvenile court's findings of fact must be of sufficient specificity to permit meaningful review. *In re Harbert,* 85 Wn.2d 719, 538 P.2d 1212 (1975). The juvenile court should be upheld unless the findings are not supported by substantial evidence or do not sustain the conclusions of law. *In re Dodge,* 29 Wn. App. 486, 628 P.2d 1343 (1981).

The consequences of a decline of jurisdiction may be severe. Although juveniles will be held accountable for their behavior, juvenile courts are vested with broad powers to provide any necessary treatment, guidance, or rehabilitation for juvenile offenders. The procedures are not as punitive as are adult criminal proceedings. *State v. Lawley,* 91 Wn.2d 654, 591 P.2d 772 (1979). Juveniles transferred for adult criminal prosecution are thereafter denied access to the juvenile courts for subsequent offenses, RCW 13.04-.030(6)(a), and must be tried as adults.

Although decline proceedings are nonadversarial, the juvenile is afforded the protections of the due process clauses of the United States and Washington constitutions. *In re Harbert, supra.* A juvenile is entitled to a hearing, access to counsel, and a statement of reasons supporting the court's decisions before juvenile court jurisdiction is declined. *Dillenburg v. Maxwell,* 70 Wn.2d 331, 413 P.2d 940, 422 P.2d 783 (1966); RCW 13.40.110, .140. *Kent v. United States,* 383 U.S. 541, 566–67, 16 L. Ed. 2d 84, 86 S. Ct. 1045 (1966), enumerated eight "determinative factors" which must be considered by the juvenile court:

1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.

3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted.

4. The prosecutive merit of the complaint, i. e., whether there is evidence upon which a Grand Jury may be expected to return an indictment (to be determined by consultation with the United States Attorney).

5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime in the U. S. District Court for the District of Columbia.

6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

7. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this Court, or prior commitments to juvenile institutions.

8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court.

All eight criteria need not exist in every case, but evidence must be presented and findings entered which demonstrate that those factors were considered. *In re Hernandez,* 15 Wn. App. 205, 548 P.2d 340 (1976).

The standardized form used by the juvenile court to decline jurisdiction in this case did not provide the necessary specificity to permit meaningful review of the court's decision. As applied to the defendant, the findings of fact are generalized, unspecific, and inadequate to justify the substantial consequences which flow from a decline of jurisdiction. Precise, specific findings are necessary to permit meaningful review. *See State v. Jamison,* 25 Wn. App. 68, 74, 604 P.2d 1017 (1979); *In re Hernandez, supra.* Juvenile courts should supplement any form with addi-

tional written details when needed to set forth fully the basis for the decline order.

■ The failure to enter more specific findings of fact is harmless error in this case, however. Examination of the entire record, including the juvenile court's detailed oral opinion, demonstrates that the *Kent* criteria furnished the basis for the court's decision. *See In re Burtts*, 12 Wn. App. 564, 530 P.2d 709 (1975). The seriousness and violent nature of the charged offenses, the substantial indications of guilt, the defendant's prior contacts with juvenile authorities, the extensive evidence on the comparative rehabilitative services offered in the adult and juvenile corrections programs, and the psychologists' inability to assure the public safety if the defendant was released at age 21 from the juvenile court's jurisdiction all point to the conclusion that the decline of jurisdiction was warranted. Substantial evidence supports the decision of the juvenile court.

■ Two months after the decline hearing, the defendant moved for reconsideration, arguing that "new evidence" was discovered in the form of the defendant's present willingness to discuss the incident and desire to testify at the decline hearing. The defendant asserted that two of the psychiatrists had reexamined him and changed their conclusions, determining that he was not a danger to the community. The motion was denied. Motions for reconsideration are addressed to the sound discretion of the trial court. *State v. Scott*, 92 Wn.2d 209, 595 P.2d 549 (1979); CR 60(b). The defendant fails to show a clear or manifest abuse of discretion. His willingness to testify after the court's decision to decline jurisdiction does not amount to "[n]ewly discovered evidence which by due diligence could not have been discovered in time to move for a new trial . . ." CR 60(b)(3).

## II

The defendant's second contention is that the communications he made to the mental health professionals appointed by the juvenile court in conjunction with the

decline hearing were impermissibly introduced by the State at the subsequent criminal prosecution. He asserts that the communications are protected by the governmental information privilege, RCW 5.60.060(5), which provides:

A public officer shall not be examined as a witness as to communications made to him in official confidence, when the public interest would suffer by the disclosure.

■ The governmental information privilege is a conditional privilege. For the statute to apply we must find that: (1) the defendant's communications with the mental health professionals were made in official confidence; and (2) the public interest will suffer by disclosure. While the privilege is more commonly invoked by the State, *see, e.g., State v. Burleson*, 18 Wn. App. 233, 566 P.2d 1277 (1977), we reject the State's contention that the privilege may only be asserted by the government. Any party satisfying the requirements of the statute may assert the privilege. Criminal defendants have asserted this privilege in the past and had the matter considered on the merits. *See, e.g., State v. Bixby*, 27 Wn.2d 144, 177 P.2d 689 (1947).

We find that the defendant's statements at the psychological examinations were not made in official confidence, and that the governmental information privilege therefore does not apply. The defendant's examination was authorized by the juvenile court and arranged by the probation counselor for inclusion in a report to the court. The disclosure of these communications was fully contemplated. Holland did not participate for purposes of treatment or advice, but rather acted to assist the court in making its decision whether to decline jurisdiction. These were not statements made in official confidence and no privilege attaches.

The use in adult criminal prosecutions of juvenile court records or statements made by juveniles while under the jurisdiction of the juvenile court has been prohibited in several states in the past. *See* Annot., 147 A.L.R. 443 (1943). In *Harling v. United States*, 295 F.2d 161, 163–64 (D.C. Cir. 1961), the court held that principles of funda-

mental fairness bar the use of a juvenile's statements at an adult criminal prosecution:

> Aside from the requirements of expressly applicable statutes, the principles of "fundamental fairness" govern in fashioning procedures and remedies to serve the best interests of the child. It would offend these principles to allow admissions made by the child in the non–criminal and non–punitive setting of juvenile proceedings to be used later for the purpose of securing his criminal conviction and punishment. Such a practice would be tantamount to a breach of faith with the child, since he cannot be charged with knowledge of either his privilege against self–incrimination or the Juvenile Court's power to waive its jurisdiction and subject him to criminal penalties. Moreover, if admissions obtained in juvenile proceedings *before* waiver of jurisdiction may be introduced in an adult proceeding *after* waiver, the juvenile proceedings are made to serve as an adjunct to and part of the adult criminal process. This would destroy the Juvenile Court's *parens patriae* relation to the child and would violate the non–criminal philosophy which underlies the Juvenile Court Act.

(Footnotes omitted.)

The only statutes in Washington governing the use of juvenile court records relate to the report of the probation counselor. *State v. Briscoe,* 78 Wn.2d 338, 474 P.2d 267 (1970); RCW 13.04.090 (repealed 1961), 13.50.050(3). Otherwise, juvenile court records are available for use in other superior court proceedings. *See State v. Dainard,* 85 Wn.2d 624, 537 P.2d 760 (1975) (superior court sentencing hearings); *State v. Briscoe, supra* (for impeachment of character witnesses). In *State v. Prater,* 77 Wn.2d 526, 463 P.2d 640 (1970), the court held that statements made freely and voluntarily by juveniles after proper warnings would be admissible at a subsequent adult criminal trial after a decline of juvenile court jurisdiction. The court distinguished *Harling v. United States, supra,* which required the exclusion of all damaging statements made by a juvenile to police prior to a waiver of juvenile court jurisdiction.

The *Harling* case was decided before *In re Gault,* 387

U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967). At the time, juvenile proceedings were considered a civil matter and constitutional rights of juveniles were not considered important in the protective, rehabilitative, and "non-adversary" procedure. There was no requirement that juveniles be advised of such rights, and thus any statement given was presumably given without an intelligent waiver of such rights.

In *In re Gault, supra,* the United States Supreme Court granted to juveniles their constitutional rights, including the right to be warned that any statement made while in custody could be used against him in a court of law. *See Miranda v. Arizona,* [384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966)].

*State v. Prater, supra* at 531. The court relied on *State v. Gullings,* 244 Or. 173, 416 P.2d 311 (1966), which concluded that the close relationship which existed between a child and the juvenile court did not extend to the child and the police.

Police are in the business of solving transgressions against the welfare of society and the apprehension of those who are responsible therefor. They are not engaged in the rehabilitation of the child and the treatment of his emotional and family problems where the free exchange of information and a close relationship is so important. The use of information secured by police will not, in our opinion, tend to make more difficult the establishment of a close relationship between juvenile workers and the child.

Nor is the integrity of the juvenile court threatened so long as constitutional due process is required whenever the police secure information which is subsequently used against the child in an adult prosecution. If information has been secured from a juvenile under the court's jurisdiction without regard for constitutional safeguards and such information is later used in an adult prosecution, the integrity of the juvenile court may be threatened. The juvenile court would then be nothing more than an adjunct to unlawful police practices.

*State v. Gullings, supra* at 179–80. *See also State v. Hunt,* 607 P.2d 297 (Utah 1980).

Unlike *Prater* and *Gullings,* the statements the defendant made in this case were made not to the police but to psychologists appointed by the defendant's juvenile court probation counselor. In *Estelle v. Smith,* 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981), the court held that statements made to psychiatrists for the purposes of a competency hearing could not be used at a subsequent criminal prosecution unless the defendant was advised of his rights.

> The considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination at issue here. Respondent was in custody at the Dallas County Jail when the examination was ordered and when it was conducted. That respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, is immaterial. When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting. During the psychiatric evaluation, respondent assuredly was "faced with a phase of the adversary system" and was "not in the presence of [a] perso[n] acting solely in his interest." *Id.,* at 469. Yet he was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death. He was not informed that, accordingly, he had a constitutional right not to answer the questions put to him.

*Estelle v. Smith,* 451 U.S. at 467, 68 L. Ed. 2d at 371–72. The court also held that the defendant was entitled to remain silent until assured that the mental health evaluations would be limited solely to the purpose for which the examination was ordered.

■ Unlike *Smith* (sentencing trials), *Prater,* and *Gullings* (adult criminal prosecutions), juvenile court decline hearings are nonadversarial. *In re Harbert,* 85 Wn.2d 719, 538 P.2d 1212 (1975). The juvenile court is charged with considering and acting in the best interests of the juvenile and of society.

In determining whether the essentials of due process and fair treatment were provided in the instant case, it is important to keep in mind the exact nature of a juvenile court transfer hearing. Such a hearing does not result in a determination of delinquency as may a hearing held pursuant to RCW 13.04.070; does not result in a determination of guilt as may a criminal trial; and does not directly result in confinement or other punishment as may both a delinquency hearing and a criminal proceeding. In short, the transfer hearing is not an adversary proceeding. Rather, the sole purpose of the transfer hearing, as we have recently said, is to determine "whether best interests of the child and of society would be served by the retention of the juvenile court authority over him or whether the juvenile, under all the circumstances, should be transferred to be tried as an adult." *In re Sheppard v. Rhay,* [73 Wn.2d 734, 440 P.2d 422 (1968)] at 738.

*State v. Piche,* 74 Wn.2d 9, 14, 442 P.2d 632 (1968). Juvenile court decline hearings may consider evidence normally excluded from adult criminal prosecutions, such as hearsay and inadmissible statements to police. *In re Harbert, supra.* The reports of psychologists, probation officers, and social agencies are admissible as well. *Dutton v. Evans,* 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970); *In re Harbert, supra.*

To hold that statements made to mental health professionals for the purposes of a juvenile decline proceeding are admissible at the adult criminal prosecution, we would have to follow *Smith* and *Prater* and require that such statements be admitted only after a judicial determination that the statements were made voluntarily after full advisement of rights. So holding would tend to convert the decline proceeding into an adversarial process and frustrate the juve-

nile court's attempts to assess the best interests of the juvenile and of society. The decline procedures should foster cooperation and candor between the court and the juvenile. Permitting the use of mental health evaluations by the State at adult criminal prosecutions could cripple this process. Additionally, we perceive a legislative intent to protect the juvenile decline proceeding by making certain information gathered for that purpose confidential and ordinarily inadmissible at a subsequent criminal prosecution, whether in the juvenile or adult divisions of the superior court.

■ RCW 13.50 governs the keeping and release of records by juvenile authorities. The "official juvenile court file," or legal file, contains those records, such as the information, counsel's briefs, and court orders, which relate to adversarial processes. RCW 13.50.010(1)(b). Unless sealed by the court, this file is open to public inspection. RCW 13.50.050(2). The juvenile's "social file" is composed of the records and reports of the probation counselor. RCW 13.50.010(1)(c). This file is confidential; the statute narrowly circumscribes the conditions for its use and release. RCW 13.50.050(3). By making the social file confidential, however, the legislature did not confer a testimonial privilege.

> It does not necessarily follow from the use of the word "*confidential*," that it was the legislative intention that this word have the same import as the word "privileged."

*State v. Thompson*, 54 Wn.2d 100, 104–05, 338 P.2d 319 (1959). Whether the legislature intended to remove the social file from all judicial inquiry or process must be determined after an examination of the statutory enactment in its entirety. *State v. Thompson, supra; Mebust v. Mayco Mfg. Co.*, 8 Wn. App. 359, 506 P.2d 326 (1973).

Juvenile court probation counselors provide a number of services to the court and to the juvenile. They make recommendations as to punishment and detention, supervise diversion agreements and disposition orders, and prepare predisposition reports. RCW 13.04.040. The relationship between the juvenile and the probation counselor is not

adversarial, in contrast to the relationship between the juvenile and the police. To avoid the creation of a purely adversarial relationship, the statutes make the probation counselor's reports confidential. This protection necessarily extends to the meetings or communications which spawned the records.

■■ The confidential status afforded the juvenile court social file does not place it beyond the reach of all judicial process. *Cf. Mebust v. Mayco Mfg. Co., supra* (relating to confidential industrial insurance claim files). The file is *available* to the juvenile as authorized by RCW 13.50-.050(6) and the rules of discovery.[4] If juvenile court jurisdiction is declined and the matter remanded for adult criminal prosecution, the State may obtain all juvenile court records as well. RCW 13.50.050(4). But the *use* of the social file at an adversary proceeding is not allowed, and a defendant may object to its use or the testimony of those who prepared the file as to information contained in the file.

In the present case, the juvenile court judge granted the defendant's motion to confine the mental health evaluations to the social file and to exclude them from the official juvenile court file. The court also ordered the social file sealed. No objection has been taken to this order; the mental health evaluations, for the purpose of this appeal, are confined to the social file. Moreover, we hold that the juvenile court acted properly in this regard. The information gathered for the purpose of the decline hearing, a nonadversarial proceeding, was properly confined to the social file and excluded from the legal file.

■■ A defendant's right to object to the admissibility of information acquired in the juvenile court social file may be

---

[4]RCW 13.50.050(6) provides:

"(6) Notwithstanding any other provision of this chapter, the release, to the juvenile or his or her attorney, of law enforcement and prosecuting attorneys' records pertaining to investigation, diversion, and prosecution of juvenile offenses shall be governed by the rules of discovery and other rules of law applicable in adult criminal investigations and prosecutions."

waived, however, and was done so in the present case. After he successfully moved to limit the mental health evaluations to the social file, counsel for Holland at the adult criminal prosecution made plain his intention to waive the confidentiality of the reports and call two of the psychologists to testify as to their evaluations of the defendant. Holland objected only to the testimony of Dr. Dreiblatt, and not to that of Drs. McDermott and Carlson. Upon its cross–examination of the defendant, the State encountered no objection to its use of the reports of Drs. McDermott and Carlson. When counsel waived the confidentiality of the evaluations of two of the psychiatrists, the defendant also waived the confidentiality of the report of the third. *State v. Tradewell,* 9 Wn. App. 821, 515 P.2d 172 (1973).

## III

The final issue for consideration is whether the defendant's due process rights were infringed when the State commented upon, at closing argument, the defendant's failure to claim that the shooting was an accident until 2 weeks after the incident. We find no error.

■ *Doyle v. Ohio,* 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), held that due process prohibits impeachment founded upon a defendant's postarrest silence following *Miranda*[5] warnings. Under *Doyle,* advisement of *Miranda* warnings implicitly assures defendants that their silence will not be used against them. In *Anderson v. Charles,* 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180 (1980), cross–examination was permitted of a defendant who did make postarrest statements.

*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross–examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving

---

[5]*Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

*Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.

*Anderson v. Charles, supra* at 408.

At the trial, the State cross–examined Holland about his failure to initially assert that the shooting was accidental. Holland conceded that, on the night the victim was found, he admitted to the shooting and did not claim it was an accident. These statements were made before his arrest and advisement of his right to remain silent. Holland volunteered this information about the shooting to the victim's family. The defendant changed his story midway through the mental health examinations. The State's cross–examination and closing argument dealt not with the defendant's silence, but with inconsistent statements made prior to his arrest and to persons who were not agents for the State. The State's closing argument was not a comment upon the defendant's silence.

The judgment and sentence is affirmed.

RINGOLD, A.C.J., concurs.

WILLIAMS, J., concurs in the result.

Reconsideration denied February 23, 1982.

Review granted by Supreme Court April 23, 1982.