[No. 63643-5. En Banc.]
Argued October 8, 1996. Decided June 26, 1997.

ANTONIAL MONROE, *Respondent*, v. JEAN SOLIZ, *as Secretary, The Department of Social and Health Services,* ET AL., *Appellants.*

JOHNSON, DOLLIVER, SMITH, and ALEXANDER, JJ., dissent by separate opinion.

*Christine O. Gregoire, Attorney General,* and *Edward Dee* and *Richard McCartan, Assistants,* for appellants.

*Patricia Arthur* of *Columbia Legal Services,* for respondent.

SANDERS, J. — This class action suit challenges the constitutionality of RCW 13.40.280 which permits the Department of Social and Health Services, with the consent of the Secretary of the Department of Corrections, to administratively transfer a juvenile offender from a detention facility to an adult prison. We uphold the constitutionality of the statute against claims that it unconstitutionally denies the right to jury trial, violates equal protection, and deprives juveniles of that process which is due, and we therefore reverse the trial court.

## FACTS

The juvenile court committed 17-year-old Antonial Monroe to a term of confinement at the Green Hill School, a detention facility for juvenile offenders operated by the Department of Social and Health Services (DSHS). While a resident, Monroe engaged in extreme misconduct including assaults against the staff and other residents. DSHS impaneled an administrative hearing pursuant to RCW 13.40.280[1] which concluded that Monroe was "a continuing and serious threat to the safety of others at the institu-

---

[1]This statute provides:

(1) The secretary, without the consent of the secretary of the department of corrections, has the authority to transfer a juvenile presently or hereafter committed to the department of social and health services to the department of corrections for appropriate institutional placement in accordance with this section.

(2) The secretary of the department of social and health services may, with the consent of the secretary of the department of corrections, transfer a juvenile offender to the department of corrections if it is established at a hearing before a review board that continued placement of the juvenile offender in an institution for juvenile offenders presents a continuing and serious threat to

tion." Clerk's Papers (CP) at 91. Monroe was then eligible for placement in an institution operated by the Department of Corrections (DOC) and integrated with adult inmates.

Monroe then sued Jean Soliz, then Secretary of DSHS, and Chase Riveland, then Secretary of DOC, to prevent his transfer. The trial court certified the cause as a class action, the class consisting of "all juveniles currently or in the future incarcerated at a facility operated by the Juvenile Rehabilitation Administration." CP at 314-15. The parties stipulated to a series of facts for purposes of cross-motions on summary judgment.[2] In a lengthy decision, the trial court granted summary judgment to offender Monroe,

---

the safety of others in the institution. The department of social and health services shall establish rules for the conduct of the hearing, including provision of counsel for the juvenile offender.

(3) Assaults made against any staff member at a juvenile corrections institution that are reported to a local law enforcement agency shall require a hearing held by the department of social and health services review board within ten judicial working days. The board shall determine whether the accused juvenile offender represents a continuing and serious threat to the safety of others in the institution.

(4) Upon conviction in a court of law for custodial assault as defined in RCW 9A.36.100, the department of social and health services review board shall conduct a second hearing, within five judicial working days, to recommend to the secretary of the department of social and health services that the convicted juvenile be transferred to an *adult correctional facility* if the review board has determined the juvenile offender represents a continuing and serious threat to the safety of others in the institution.

The juvenile has the burden to show cause why the transfer to an adult correctional facility should not occur.

(5) A juvenile offender transferred to an institution operated by the department of corrections shall not remain in such an institution beyond the maximum term of confinement imposed by the juvenile court.

(6) A juvenile offender who has been transferred to the department of corrections under this section may, in the discretion of the secretary of the department of social and health services and with the consent of the secretary of the department of corrections, be transferred from an institution operated by the department of corrections to a facility for juvenile offenders deemed appropriate by the secretary.

RCW 13.40.280.

[2]The stipulated facts were:

1. Antonial Monroe is a juvenile offender who was committed by a juvenile court, without the right to a jury trial, to a term of confinement in a DSHS

holding the statute violated his constitutional right to a jury trial under the Sixth Amendment of the federal constitution and under article I, section 21 of the state constitution, and violated his constitutional guarantees of equal protection and due process. The State appealed directly to this court which retained review.

## STANDARD OF REVIEW

 Review of a summary judgment requires this court to engage in the same inquiry as the trial court. *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990). We review questions of law de novo. *Mountain Park*

---

institution under chapter 13.40 RCW. Antonial did not request that the juvenile court decline jurisdiction so that he could be tried as an adult.

2. At all times relevant to the issues raised in this case, Antonial resided at Green Hill School, an institution for juvenile offenders operated by DSHS, and he had never been convicted of a crime.

3. An administrative hearing was held on March 1 and March 13, 1995, under RCW 13.40.280(2) and Chapter 275-33 WAC to determine whether Antonial should be transferred to an adult prison operated by DOC. The hearing panel recommended that the Secretaries of DOC and DSHS transfer Antonial to a DOC facility because he "is a continuing and serious threat to the safety of others at the institution."

4. The Secretaries of DSHS and DOC approved of the transfer.

5. At the administrative hearing, the rules of evidence did not apply. The panel was not required to, and did not consider whether the [*Kent v. United States*, 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966)] criteria or the criteria set forth in RCW 13.40.110 were met.

6. If transferred, Antonial may be placed in any institution operated by DOC. Antonial would not be segregated from adult inmates at DOC. Like an adult inmate, he could be placed in protective custody if necessary for his protection.

7. At both DSHS and DOC facilities, residents may have the opportunity to participate in rehabilitation programs. At DOC there are no programs designed exclusively for juveniles.

8. In the future, DSHS considers any juvenile offender in a DSHS institution eligible for transfer to DOC if the criteria of RCW 13.40.280(2) are met and the procedures set forth in Chapter 275-33 WAC are followed.

9. The procedures afforded to juveniles transferred to DOC pursuant to RCW 13.40.280(2) are different than those afforded to juveniles who are committed to DOC after being tried as an adult in that the former are not entitled to a jury trial or judicial findings of guilt beyond a reasonable doubt that result in a criminal conviction.

10. The parties agree that the facts in this stipulation constitute all the material facts necessary to determine on summary judgment whether RCW 13.40.280(2) is unconstitutional.

CP at 319-21.

*Homeowners Ass'n v. Tydings,* 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). This is a facial challenge to the constitutionality of this statute which raises purely legal questions.

## ANALYSIS

### *Right to Jury Trial*

Monroe argues RCW 13.40.280 violates his right to trial by jury because it permits the state to punish a juvenile in the same manner as a convicted criminal by incarcerating the juvenile in an adult prison. He argues the two systems have different goals, purposes, procedures and punishments, they are functionally distinct, and the state therefore cannot place a juvenile in an adult prison without benefit of a trial by jury.

We disagree. The statute does not deprive Monroe and the class he represents of his right to a jury trial because he has none in a juvenile proceeding. The nature of incarceration remains juvenile regardless of the custody venue. This state statute merely changes that venue.

The difference between Washington's juvenile justice and adult criminal systems are well-defined in our law. A juvenile is any individual who is under the chronological age of 18 years. RCW 13.04.011. Juveniles do not commit "crimes." Instead they commit "offenses" or "violations," which the Legislature has defined as acts which, if committed by an adult, would constitute a crime. RCW 13.40.020(19). RCW 13.04.030 provides the juvenile courts have exclusive original jurisdiction over juveniles alleged to have committed offenses, except in certain specified cases, or when the juvenile court transfers jurisdiction to adult criminal court pursuant to RCW 13.40.110.

The purpose of the juvenile justice system is ostensibly to establish a system having primary responsibility for, and responding to, the needs of offenders, as well as to hold juveniles responsible for their offenses. *State v. Rice,* 98 Wn.2d 384, 392, 655 P.2d 1145 (1982). The critical

distinction between the two systems lies in the Juvenile Justice Act of 1977's (JJA) policy of responding to the needs of juvenile offenders. *Rice*, 98 Wn.2d at 392. We have in the past found such a policy as rehabilitative in nature, whereas the criminal system is punitive. *State v. Schaaf*, 109 Wn.2d 1, 4, 743 P.2d 240 (1987). Such differences have led us to consistently conclude the right to a jury trial does not extend to juveniles adjudicated in juvenile proceedings. *See Estes v. Hopp*, 73 Wn.2d 263, 438 P.2d 205 (1968); *State v. Lawley*, 91 Wn.2d 654, 591 P.2d 772 (1979); *Schaaf*, 109 Wn.2d 1.

Monroe's basic claim is that the administrative transfer of a juvenile from a detention facility to an adult prison alters the focus of the juvenile's incarceration, changing it from rehabilitative to punitive. Thus, Monroe argues, because he would be punished if housed in the adult prison, the law affords him a right to a jury trial. We believe this overstates the nature of the administrative transfer. At the heart of the issue is whether the place of a person's confinement defines the nature of the proceeding. RCW 13.40.280 does not, and cannot, substantively convert a juvenile proceeding to a criminal one. The basis for the juvenile's custody has not changed. The statute merely permits the State to change the place of confinement based upon an administrative determination that the juvenile "presents a continuing and serious threat to the safety of others in the institution." RCW 13.40.280(2).

While an inmate's place of confinement may be an indicium of the nature of the proceeding, it is not the sole indicium, nor is it dispositive. Housing a juvenile in an adult prison does not substantively change the nature of the juvenile's detention. A criminal conviction carries far more serious ramifications for an individual than a juvenile adjudication, no matter where the juvenile serves his time.

By proceeding in a juvenile court the State protects offenders "against [the] consequences of adult conviction such as the loss of civil rights, [and] the use of adjudica-

tion against him in subsequent proceedings. . . ." *Kent v. United States,* 383 U.S. 541, 557, 86 S. Ct. 1045, 1055, 16 L. Ed. 2d 84 (1966).[3] Washington law permits the State to destroy all juvenile records when a juvenile offender attains the age of 23, while an adult conviction is permanently engraved on the defendant's record. RCW 13.50.050(23)(a). The State can imprison the adult offender until the end of his term regardless of the age of the prisoner; however, the sentence for a juvenile offender, no matter how callous or brutal he may have been, cannot extend beyond the age of 21. RCW 13.40.300.

Moreover, even after DSHS transfers a dangerous juvenile like Monroe to DOC, the two agencies may subsequently agree to return him to the juvenile institution at any time. RCW 13.40.280(6). A convicted criminal in the adult system has no such opportunity. In addition, once the juvenile court declines jurisdiction over a defendant and transfers him to adult court, the State treats him as an adult for all future offenses. *State v. Mitchell,* 32 Wn. App. 499, 500, 648 P.2d 456 (1982); *see also State v. Holland,* 30 Wn. App. 366, 373, 635 P.2d 142 (1981) ("Juveniles transferred for adult criminal prosecution are thereafter denied access to the juvenile courts for subsequent offenses . . . and must be tried as adults."), *aff'd,* 98 Wn.2d 507, 656 P.2d 1056 (1983). A transferred juvenile, on the other hand, who is released and commits another offense is not automatically subject to adult prosecution.

All told, an adult criminal conviction and an administrative transfer of a juvenile to adult prison are entirely different. An administrative transfer does not convert a juvenile adjudication into an adult conviction. Where the adult offender retains the right to jury trial, the juvenile retains the rights, protections, and benefits inherent in the juvenile justice system no matter where he is incarcerated.

---

[3]The Court also noted in *Kent* that one of the things that differentiated a juvenile adjudication from an adult conviction is the juvenile "may be confined, *but with rare exceptions* he may not be jailed along with adults." *Kent,* 383 U.S. at 556, 86 S. Ct. at 1055 (emphasis added).

The behavior of the young person at issue here can no longer be controlled by the staff at a juvenile institution.[4] An administrative panel has determined he represents a continuous and serious threat to the safety of the staff and

[4]The "Review Panel Findings of Fact, Conclusions of Law, and Decision" in Monroe's case, for example, are illustrative of what sort of problems such juveniles present for the staff and residents of the juvenile institution. In one month, Monroe committed the following acts:

10. On December 7, 1994, the resident was unruly and threatened to hit staff with a chair. He did not respond to directions and broke his "personals box" after refusing to return the box to the office. On this same day he refused staff directives and defaced the walls with a pencil. He again engaged in door banging behaviors and banged on the plexiglass cover of a camera in his room.

11. On December 8, 1994, the resident made unwanted physical contact on staff, threatened to assault staff, and intentionally spilled juice on staff.

12. On December 9, 1994, the resident threw a cup of urine on a staff member, hitting the staff member in the face and shoulder area. As a staff member was removing a piece of paper which the resident placed over a camera in his room, the resident threatened staff, stating "when I cut your throat, I'll write on the wall with your blood."

13. On December 11, 1994, the resident swung at a staff member with his fists and elbowed the staff member in the right shoulder as the staff member was trying to restrain the resident. On this same day, the resident set a fire in his room, causing the cottage to be evacuated and the fire department to be called to the school.

14. On December 13, 1994, the resident attempted to attack staff. The resident resisted restraint and attempted to kick security staff.

15. On December 16, 1994, the resident refused staff directives and pushed a staff member in the chest with both hands.

16. On December 20, 1994, the resident entered the office of an academic school counselor to demand that he be enrolled in weight training. The resident took a very aggressive posture and stormed out of the office.

17. On December 21, 1994, the resident slapped a peer in the back of the head and a physical and verbal confrontation ensued.

18. On December 22, 1994, the resident refused directives and spit on security staff as they were placing him in his room.

19. On December 23, 1994, the resident refused directives and while being restrained, the resident tried to bite and scratch staff. The resident then spit on staff.

Clerk's Papers at 88-89. In all, these findings of fact cataloguing Monroe's behavior run four pages. The trial court did not consider Monroe's lengthy and disturbing record of assaultive and disruptive behavior in deciding the cross motions for summary judgment because it was not part of the stipulated facts. It is, however, part of the record before us. Monroe's record demonstrates the danger in which he and the other members of his class place the staff and residents of the juvenile institution. This court is cognizant of the fact that a decision in the plaintiff's favor would place numerous individuals in an extremely dangerous situation. We will not rob them of the security the Legislature has determined they require in dealing with people like Monroe.

other residents in the institution. He must be housed in a secure facility to protect the safety of not only the staff but also other residents. If the only secure facility capable of dealing with such an individual is an adult prison then that is where the State must keep him.

The Legislature enacted the statute in recognition of "the ever-increasing severity of offenses committed by juvenile offenders residing in this State's juvenile detention facilities and the increasing aggressive nature of detained juveniles due to drugs and gang-related violence." RCW 13.40.280 (Purpose—1989, ch. 410). Its purpose "is to provide necessary protection to state employees and juvenile residents of these institutions from assaults committed against them by juvenile detainees." *Id.* The statute facially designates an appropriate place of confinement for the juvenile offender who manifests an uncontrollable and aggressive nature. This is purely a custodial question. Neither can we say the State has a constitutional duty to build an intermediate institution, between a prison and a juvenile detention facility, as its only option to deal with vicious youthful offenders who continue to enjoy the lenient benefits of the juvenile process.

This statute fulfills the JJA's goal to "rehabilitate, correct and direct an errant youth . . . ." *Lawley*, 91 Wn.2d at 656-57. An errant youth cannot be rehabilitated, corrected, or directed if he is in constant fear of assault from a dangerous fellow resident. As the Supreme Court of Tennessee stated:

> It was clearly foreseen by the Legislature when the Juvenile Court and other reformatory statutes were enacted that provision should be made for screening incorrigibles from other inmates who were being given an opportunity to be trained in good citizenship. With this in view, it was provided . . . that the unruly, the incorrigible, whose baneful influence was detrimental of the best interest of the institution, should be placed elsewhere. It was a matter of wise administration of an institution erected for the betterment of wayward young people, and not an added punishment for crime. . . . We think it was clearly within the police power of the State to

make provision for the transfer of unruly inmates from one institution to another where such transfer is not arbitrary or capricious but in the enforcement of reasonable discipline.

*Harwood v. State ex rel. Pillars*, 184 Tenn. 515, 201 S.W.2d 672, 674-75 (1947); *see also Long v. Langlois*, 93 R.I. 23, 170 A.2d 618, 620 (1961) ("This statute, far from defeating the purpose of the juvenile court which is to reform minors brought before it, is designed to aid by giving the right to the assistant director of social welfare to transfer from the school those who, by their actions, are failing to reform and are hurting the rest of the school.").

Absent such flexibility, the staff and residents of juvenile institutions are condemned to spend their days under the continuous threat of people like Monroe. This seriously interferes with the stated purpose of the JJA to create a system capable "of having primary responsibility for, being accountable for, and responding to the needs of youthful offenders . . . ." RCW 13.40.010(2). To hold otherwise would interfere with the "necessary treatment, supervision, and custody for juvenile offenders" by exposing the residents of juvenile institutions to the almost daily disruptions of juvenile inmates like Monroe. RCW 13.40.010(2)(f).

A juvenile justice system "no matter how idealistic, has to cope with difficult, sometimes dangerous youths; and there may be compelling reasons not to require taxpayers to support a duplicate set of secure detention facilities everywhere, as might be necessary if juvenile . . . security problems could never be housed, no matter how briefly, in an adult facility." *Osorio v. Rios,* 429 F. Supp. 570, 574 (D.P.R. 1976). We cannot in good conscience sentence the staff and corrigible residents of juvenile institutions to live and work with juveniles who are a "continuing and serious threat to the safety of others in the institution." RCW 13.40.280(3).

Our constitution has not been construed to guarantee the right of trial by jury in juvenile proceedings, and this proceeding remains juvenile in form and substance regardless of the site of incarceration. Consequently, we reverse the trial court's grant of summary judgment on this point.

■ ■ However, we are also not unmindful of the problems, both legal and practical, inherent in housing administratively transferred juveniles with adult convicts. The parties stipulated to the fact that the DOC would not segregate Monroe from other adult prison inmates after his administrative transfer. Such a scenario presents unacceptable risks to a juvenile's safety and may interfere with the JJA's goal to respond to the needs of the youthful offenders. RCW 13.40.280 must be read in conjunction with RCW 13.04.116(1)(a) which requires juveniles who are housed in a jail or adult-holding facility be confined "separate from the sight and sound of adult inmates. . . ." When "statutes relate to the same thing or class, they are in pari materia and must be harmonized if possible." *King County v. Taxpayers of King County*, 104 Wn.2d 1, 9, 700 P.2d 1143 (1985). *See also Snohomish County Pub. Util. Dist. v. Broadview Television Co.*, 91 Wn.2d 3, 8, 586 P.2d 851 (1978) (same); *State v. Fairbanks*, 25 Wn.2d 686, 690, 171 P.2d 845 (1946) ("It is a cardinal rule that two statutes dealing with the same subject matter will, if possible, be so construed as to preserve the integrity of both."). Juvenile offenders transferred to adult prison pursuant to RCW 13.40.280 must therefore be segregated from adults. This result is also consistent with the purposes of the JJA to respond to the needs of the youthful offender.

We also stress the high standard of misconduct which the State must prove in order for the juvenile to be transferred lawfully. The State must prove the juvenile presents a continuing and serious threat to the safety of others. This requirement is as binding on an administrative tribunal as on a court of law.

## Due Process and Equal Protection

Recognizing the administrative transfer at issue here merely changes the place of confinement for juvenile offenders and does not substantively alter the nature of the juvenile's detention, Monroe's other claims are easily resolved.

■ Monroe argues RCW 13.40.280 violates due process because the procedural protections inherent in a "decline" hearing are not present, citing *Kent v. United States,* 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966). There the United States Supreme Court held due process requires a judicial hearing prior to a juvenile decline and remanded for prosecution as an adult. However, as noted above, RCW 13.40.280 does not allow transfer of a juvenile from the juvenile *system*, it merely places the juvenile in a segregated adult penitentiary. All attendant rights and responsibilities of the juvenile in the juvenile system continue to adhere after transfer. *Kent* is therefore inapplicable. RCW 13.40.280 provides adequate process: the infringement on the juvenile's liberty interest is slight given the juvenile stays within the same detention system. *See Vitek v. Jones,* 445 U.S. 480, 494-95, 100 S. Ct. 1254, 1264-65, 63 L. Ed. 2d 552 (1980) (transfer of adult prisoner to mental institution at a minimum requires written notice, a hearing, an opportunity to present testimony, an independent decision-maker, written statement of fact-finding, availability of legal counsel, and timely notice).

Finally, Monroe argues, and the trial court held, the statute violates equal protection guarantees because it permits a juvenile to enter the adult prison system in a manner substantially different from all those already incarcerated.

■ The equal protection clauses of the state and federal constitutions require that persons similarly situated with respect to the legitimate purpose of the law receive like treatment. *Harmon v. McNutt,* 91 Wn.2d 126, 130, 587 P.2d 537 (1978). The trial court found because the statute did not follow *Kent,* two different classes of juveniles were created—administratively transferred juveniles and declined juveniles—and both classes were placed in the custody of DOC. Thus, according to the trial court, declined juveniles and administratively transferred juveniles both reside under the care of DOC but do not receive equal procedural treatments.

Once again, the trial court's determination rests upon the belief RCW 13.40.280 transforms a juvenile adjudication to an adult conviction. However, as we indicated above, administrative transfer merely changes the place of the juvenile's confinement. The transferred juvenile is not encumbered with the far more onerous ramifications of an adult conviction as is the declined juvenile. Thus, the two classes of juveniles under DOC supervision are not similarly situated, and Monroe's equal protection argument must fail.

## CONCLUSION

RCW 13.40.280 is constitutional. RCW 13.40.280 does not deprive an administratively transferred juvenile of the right to a jury trial because he has none in the first instance. Nor does the statute violate constitutional guarantees of equal protection and due process. Consequently, we reverse summary judgment and reverse an award of reasonable attorney fees.

DURHAM, C.J., and GUY, MADSEN, and TALMADGE, JJ., concur.

JOHNSON, J. (dissenting) — This case involves the constitutional right to a jury trial. The majority denies this fundamental right to juveniles who have never been convicted of a crime, and yet are imprisoned with adults in an adult penitentiary. The majority denies this right under the guise that an administrative transfer of a juvenile from a juvenile detention facility into an adult penitentiary merely changes the place of confinement. I cannot support this viewpoint. The majority's holding requires a finding that the end result, the place of punishment, is interchangeable between two systems that have different purposes and afford different procedural safeguards. The majority's holding also requires a factual finding of similarity between a juvenile detention facility and an

adult penitentiary. I refuse to equate time spent in a juvenile detention facility with a sentence in adult prison.

The majority, in setting out the facts of this case, characterizes Monroe's conduct as "extreme misconduct." Majority at 416. This characterization is based on the Department of Social and Health Services' (DSHS) findings, which characterized some of Monroe's misconduct as "assaults." However, an assault is a legal definition of a criminal act. If Monroe committed an assault while confined in a juvenile detention facility, there exists a procedure under which he may be charged, "declined" to an adult court, provided all attendant constitutional rights and, if convicted, punished in the adult system. RCW 13.40.110. If our present juvenile justice and adult criminal systems are to remain separate and intact, only conviction of a crime founded upon a criminal prosecution with all constitutional safeguards can result in incarceration in an adult prison. I would hold RCW 13.40.280 unconstitutional because it violates the constitutional right to a jury trial.

RCW 13.40.280 gives the Secretary of DSHS, with the consent of the Secretary of the Department of Corrections (DOC), the authority to transfer a juvenile in the custody of DSHS to DOC on the basis of an administrative hearing, which is based on new findings of fact regarding the juvenile's conduct. The majority recognizes our juvenile justice and adult criminal systems are separate and distinct. The majority also recognizes our cases denying juveniles the right to a jury trial *in the juvenile system* have grounded their reasoning in the differences between the juvenile and adult systems. *In re Welfare of Estes*, 73 Wn.2d 263, 438 P.2d 205 (1968); *State v. Lawley*, 91 Wn.2d 654, 591 P.2d 772 (1979); *State v. Schaaf*, 109 Wn.2d 1, 743 P.2d 240 (1987). In denying the right to a jury trial to juveniles adjudicated in the juvenile system, we have emphasized that juvenile proceedings are rehabilitative in nature and, thus, distinguishable from adult criminal proceedings. *Schaaf*, 109 Wn.2d at 4.

The United States Supreme Court has recognized juvenile proceedings as civil, not criminal, in nature; therefore, the juvenile is constitutionally entitled to only certain procedures and benefits as a consequence of the statutory right to exclusive juvenile jurisdiction. *Kent v. United States*, 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966). It is the rehabilitative nature of the juvenile system and its less onerous punishment that account for the relaxation of some of the constitutional procedures afforded adults in the criminal system, including the right to a jury trial. *See McKeiver v. Pennsylvania*, 403 U.S. 528, 545, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971) (reasoning that a jury trial in juvenile proceedings would put an end to the idealistic prospect of an intimate, informal, *protective* proceeding); *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967) (holding juvenile proceedings that lead to commitment in state facilities for delinquents must measure up to the essentials of due process and fair treatment).

The right to a jury trial in criminal prosecutions under the federal and state constitutions is well established. *Duncan v. Louisiana*, 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968); *City of Pasco v. Mace*, 98 Wn.2d 87, 653 P.2d 618 (1982). The United States Supreme Court has held the federal right to a jury trial under the Sixth Amendment attaches from the first moment of a criminal proceeding, except in that class of offenses known as petty. *Callan v. Wilson*, 127 U.S. 540, 8 S. Ct. 1301, 32 L. Ed. 223 (1888). We have held article I, section 21 of our state constitution affords broader protection and guarantees the right to a jury trial for any adult criminal offense. *City of Pasco*, 98 Wn.2d at 96-97. A juvenile adjudicated as an adult within the adult system is entitled to the same right to a jury trial as is an adult. *Kent*, 383 U.S. at 568 (App. to Op. of the Ct.).

Further, whenever a juvenile is transferred into the adult system in a decline proceeding under RCW 13.40.110, that juvenile is entitled to certain safeguards in addition

to those afforded an adult charged with a crime. After a juvenile is charged in the juvenile system, the juvenile, the prosecutor, or the court itself may request a transfer to the adult criminal system for prosecution. RCW 13.40.110. Before transfer, the court must conduct a hearing to determine whether to decline juvenile court jurisdiction and prosecute the juvenile as an adult.

The Supreme Court has set forth specific factors for courts to use in this determination,[5] and we adopted these factors to apply to RCW 13.40.110 in *State v. Holland*, 98 Wn.2d 507, 517, 656 P.2d 1056 (1983). In addition to the *Kent* factors, the court must determine the treatment of the juvenile is consonant with the purpose of the Juvenile Justice Act of 1977 and record in writing its reasons for declination in a manner sufficient for meaningful review. *Holland*, 98 Wn.2d at 516. The court must also find the declination is in the best interest of the juvenile or the public. RCW 13.40.110(1)(a) and (3). After the juvenile has been charged, declined, tried (with the attendant right to a jury trial under the federal and state constitutions), and

---

[5]The eight determinative factors are:

"1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

"2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.

"3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted.

"4. The prosecutive merit of the complaint, i.e., whether there is evidence upon which a Grand Jury may be expected to return an indictment (to be determined by consultation with the United States Attorney).

"5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime in the U. S. District Court for the District of Columbia.

"6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

"7. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this Court, or prior commitments to juvenile institutions.

"8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court." *Kent*, 383 U.S. at 566-67 (App. to Op. of the Ct.).

convicted, imprisonment in an adult institution in Washington may be imposed.

Thus, both adults and juveniles initially committed to the adult criminal justice system for punishment in adult prison have been afforded a jury trial and due process protections in a judicial setting. They have been found guilty of a crime. Juveniles transferred into the adult system under RCW 13.40.280, on the other hand, have been adjudicated in the juvenile system, found guilty of an offense (not a crime), and under the statutory procedures in question here, transferred into the adult system for placement in adult prison on the basis of a new finding of fact in an administrative hearing. This procedure results in the juvenile being punished as a convicted criminal without the same constitutional right to a jury trial afforded those criminally convicted.

It is exactly the differences between the rehabilitative purposes of juvenile placement and adult punishment which have allowed us to find that fewer constitutional safeguards are necessary in the juvenile system— safeguards such as the right to a jury trial. The majority finds the end result, the place of punishment, is interchangeable between two systems that have different purposes and afford different procedural safeguards.

Citing to differences between a juvenile adjudication and an adult criminal conviction, the majority concludes that because a transfer to an adult prison does not carry the same "ramifications" as does an adult conviction the transfer is constitutionally permissible. Majority at 420-21. However, it is, in large part, the place of punishment in the juvenile system that allows us to deny a juvenile the right to a jury trial *within the juvenile system.* If the place of punishment is changed to that of an adult institution, it is not at all clear that other advantages of the juvenile system over that of the adult system would dictate the result that the juvenile not be entitled to a jury trial. This result opens an administrative back door into adult prison.

The majority states, "[t]he nature of incarceration remains juvenile regardless of the custody venue." Majority at 419. However, the transfer statute allows a juvenile adjudicated in the juvenile system to then be incarcerated in a DOC *adult* facility. This is not a juvenile incarceration as defined by statute and our previous cases. Further, the parties stipulated to the fact Monroe will not be segregated from adult inmates and there are no rehabilitative programs at DOC that are. designed for juveniles. Stipulated Facts 6, 7 (Clerk's Papers at 320).

The majority also states, "the juvenile retains the rights, protections, and benefits inherent in the juvenile justice system no matter where he is incarcerated." Majority at 421. I cannot support this proposition. By placing a juvenile who has never been convicted of a crime into an adult prison without the attendant right to a jury trial, the juvenile loses all rehabilitative focus of the juvenile system. He is, instead, placed under the adult system's focus of punishment.

If juveniles can be administratively transferred into adult prisons to serve out their juvenile sentences, the juvenile justice system loses its separate identity. RCW 13.40.280 violates the fundamental right to a jury trial. I dissent.

DOLLIVER, SMITH, and ALEXANDER, JJ., concur with JOHNSON, J.