[No. 48519-4.   En Banc.   January 6, 1983.]

THE STATE OF WASHINGTON, *Respondent*, v. DANIEL W. HOLLAND, *Petitioner*.

*William A. Jaquette* of *Eastside Defender Association,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Andrew R. Hamilton, Deputy,* for respondent.

PEARSON, J.—Defendant Daniel W. Holland, a juvenile, appeals the juvenile court's decline of jurisdiction over him and his subsequent conviction of second degree murder and second degree rape.

Two issues are presented in the appeal. First, do the trial court's oral and written findings support its decision to decline jurisdiction over defendant? Second, does any constitutional or statutory privilege extend to statements made by defendant to court appointed mental health professionals during an evaluation prior to the decline hearing? We hold that the court's written findings, although insufficient in themselves, when considered together with the court's oral opinion, are sufficient to support its decision to decline

jurisdiction. On the second issue, we hold that the Fifth Amendment privilege against self–incrimination protects statements made during evaluations prior to the decline hearing, but this privilege may not be used to prevent the State's impeaching a defendant's credibility after he chooses to testify.

On August 14, 1979, 11–year–old Ruth Spencer was shot once in the head and buried in a shallow grave near her parents' home in Maple Valley. The victim's cousin, defendant Daniel Holland, admitted killing the victim and was charged with first degree murder and second degree rape. At a hearing pursuant to RCW 13.40.110(1)(a), held on September 25, 1979, the juvenile court declined jurisdiction over the 16–year–old defendant. After being tried as an adult, defendant was convicted on December 12, 1979, of second degree murder and second degree rape.

The crimes were discovered on the evening of August 14 when Terry Spencer found the body of his sister Ruth buried in the yard of their parents' home. When confronted with the body, defendant, who was living with the Spencer family, said that he had shot the victim. He was formally arrested shortly thereafter by King County Police officers and made a statement to these officers. (This statement was subsequently held inadmissible.) An autopsy revealed that the victim had been shot once in the head, and that within hours of her death sexual intercourse had occurred. The victim had not had intercourse prior to this occasion.

At the detention hearing pursuant to RCW 13.40.050, the court found probable cause to support the allegations that defendant had committed offenses, ordered defendant detained until a decline hearing in September 1979, and ordered psychiatric and psychological evaluation of defendant prior to that hearing.

Defendant's caseworker, James Fox, employed Dr. Gordon Carlson, Dr. James McDermott, and Dr. Irwin Dreiblatt to perform the court ordered evaluations. All three mental health professionals interviewed defendant and apparently prepared written reports which were presented

to the trial court (but which are not part of the record before the Court of Appeals or this court).

At the decline hearing on September 25, 1979, the court heard testimony from Drs. Carlson, McDermott, and Dreiblatt, from Mr. Fox, and from Dr. Donald Johns, a psychologist retained by the defense. Their testimony revealed that defendant had a troubled background. His parents had separated before his birth. He lived with his mother until her death when defendant was age 5. Defendant went to live with his father and stepmother, who abused or at least neglected him. In 1973, defendant ran away from home, was made a dependent ward of the Clark County Juvenile Court, and placed in a foster home. For the next 5 years, defendant lived in a series of foster homes until the fall of 1978, when his family placed him in the home of his mother's sister and her husband, the parents of the victim, Ruth Spencer.

All three mental health professionals who evaluated defendant agreed that he had limited intelligence, was emotionally immature and unsophisticated, and possibly suffered a degree of brain damage. They all considered that defendant would receive better treatment in juvenile facilities than he would in adult detention institutions. Dr. Johns, a psychologist with the Division of Adult Corrections of the Department of Social and Health Services for 12 years, testified that adult detention would be unsuitable for defendant even for short-term placement. He gave two reasons: the dangers to a young person from the other prisoners, and the enormous difficulties caused by overcrowding and understaffing in adult institutions. "It's simply an unthinkable place for any young person at this point in our history."

The court heard testimony that the maximum sentence which could be imposed by the juvenile system upon defendant was 192 weeks, and the minimum, 153 weeks; it was, moreover, theoretically possible that defendant could be released into a community program after as little as 20 months' detention.

None of the three mental health professionals was able to predict whether defendant would continue to be a danger to society in the future. In particular, they refused to predict that defendant would be successfully treated in the time available to the juvenile system, so as to avoid future acts of violence. However, they agreed that a better chance of successful treatment lay with the juvenile system than with the adult system. Dr. Johns took a slightly different approach, concluding from statistical tables that there was a 98 percent chance that defendant would not commit a similar offense in the future.

The only witness to recommend that juvenile jurisdiction be declined was defendant's probation officer, James Fox. He testified that the decision was excruciating for him because the needs of the defendant conflicted so violently with the expectations of the community. He agreed with the other witnesses that defendant's interests would be best served by the juvenile system, but he concluded that there was so much uncertainty as to defendant's future dangerousness that the needs of society required defendant's being handled by the adult system.

The court declined jurisdiction over defendant, setting forth its reasons in an oral opinion (set out in opinion of the Court of Appeals, *State v. Holland,* 30 Wn. App. 366, 370 n.3, 635 P.2d 142 (1981)). The trial court concluded that there would be more "flexibility" in providing services to defendant if the adult courts could retain jurisdiction over him beyond his 21st birthday. The court's written findings, required by RCW 13.40.110(3), consisted of a standardized form on which the court checked off two reasons supporting its decision to decline.[1]

---

[1]The pertinent portion of the standardized findings of fact reads as follows:
"A prima facie case has been established.

___x___  The evidence of the offense(s), as to all Count(s)_____,
appears to be sufficient to be considered by a jury in a criminal case in a felony prosecution.

_____  The evidence of the offense(s), as to Count(s) _____,
appears to be sufficient to be considered by a jury in a criminal case in a misde-

Defendant subsequently requested the court to reconsider its decision to decline jurisdiction and to enter more specific findings and conclusions. The court denied both requests and defendant was tried as an adult on December 3, 1979.

Defendant's position at trial was that the victim had consented to sexual intercourse, and that he had accidentally shot her while pointing a rifle at her to frighten her.

Defendant testified that the victim came to his basement bedroom, she voluntarily removed her pants, and they engaged in sexual intercourse. She subsequently began to tease him and he went upstairs into the house. As he went upstairs, the thought "popped into [his] mind" to get a gun and scare her in retaliation for her teasing. Defendant obtained a gun from his uncle's bedroom, returned to the basement where the victim remained sitting on his bed, and pointed the gun at her. He stepped backwards, stumbled over something, and the gun fired. He buried the body to conceal the victim's death until he could figure out how to tell the Spencers he had killed their daughter.

---

meanor/gross misdemeanor prosecution.

  x    The protection of the community requires a decline due to the seriousness of the alleged offense(s), which was/were committed in an aggressive, violent, premeditated or willful manner.

      The alleged offense(s) should be heard in one court by reason of the respondent's (juvenile's) associate(s) in the alleged offense(s) being (an) adult(s) who will be/are charged with a crime.

      The sophistication and maturity of the respondent (juvenile) by consideration of the investigation as shown of his/her home, environmental situation, emotional attitude and pattern of living is such that he/she should be treated as an adult.

      The previous record and history of the above respondent (juvenile) including previous contacts with law enforcement agencies, Juvenile Courts and other jurisdictions indicate no beneficial resources available to said juvenile through the Juvenile Department of this Court.

      A prior period of supervision has been afforded.

      A prior commitment to a juvenile institution has been made.

      There are no further resources available in the Juvenile Department of this Court.

      The declination is in the best interest of the respondent."

The court in the present case checked the first and third paragraphs (sufficient evidence and protection of the community).

The defense also called Drs. McDermott and Carlson, whose testimony was similar to that at the decline hearing, covering defendant's tragic odyssey from one foster home to another, his mental deficiencies, and his emotional abnormalities.

In the course of the trial, several references were made to statements made by defendant to the mental health professionals appointed to evaluate him prior to the juvenile decline hearing. These references may be summarized as follows:

1. In the cross examination of defendant, the prosecutor, over defense objections, referred to statements made by defendant to Drs. Dreiblatt, Carlson, and McDermott, which were inconsistent with his testimony.

2. Dr. Carlson, under cross examination, referred to a statement made to him by defendant that defendant had thought about having intercourse with the victim some hours before the intercourse took place.

3. The court admitted, over objections, a document entitled "My Thoughts" written by defendant at Dr. Dreiblatt's request. The document is not a part of the record, but apparently contained some damaging admissions.

4. Dr. Dreiblatt testified for the prosecution as a rebuttal witness, over defense objections. He testified that defendant told him after he had sexual intercourse with the victim, he went upstairs to obtain the gun and thought, "I should shoot her." Defendant also told Dr. Dreiblatt that when he actually fired the gun he meant to scare her, not kill her. Dr. Dreiblatt could not get defendant to see the inconsistency between these two statements.

The jury found defendant guilty of second degree murder and second degree rape, and on February 11, 1980, defendant was sentenced to consecutive sentences of 20 years and 10 years. Defendant appealed, challenging the decline of juvenile jurisdiction and the admission of his statements made to mental health professionals. The Court of Appeals affirmed defendant's conviction, holding that the decline of juvenile jurisdiction was adequately supported by the

record, and that defendant had waived his right to object to Dr. Dreiblatt's testimony by calling as witnesses Drs. Carlson and McDermott.

We first consider the juvenile court's decision to decline jurisdiction. Whenever a 16- or 17-year-old is charged with a class A felony, a hearing on the question of declining jurisdiction is mandatory unless waived by the court, the parties, and their counsel. RCW 13.40.110(1). RCW 13.40-.110(2) and (3) provide:

> (2) The court after a decline hearing may order the case transferred for adult criminal prosecution upon a finding that the declination would be in the best interest of the juvenile or the public. The court shall consider the relevant reports, facts, opinions, and arguments presented by the parties and their counsel.
> (3) When the respondent is transferred for criminal prosecution or retained for prosecution in juvenile court, the court shall set forth in writing its finding which shall be supported by relevant facts and opinions produced at the hearing.

In the present case, the trial court explained in an oral opinion its decision to decline, and checked two boxes in the standard form findings of fact. Defendant argues that the standardized form on which the boxes were checked is an insufficient record to permit meaningful appellate review, and, alternatively, that the two factors which were checked are insufficient to justify a decline of jurisdiction. The prosecution argues that the record is sufficient to support the decision to decline. The Court of Appeals held that the standardized form "did not provide the necessary specificity to permit meaningful review." *State v. Holland,* 30 Wn. App. at 374. Nevertheless, the error was harmless because the Court of Appeals examination of the entire record satisfied it that substantial evidence supported the decline decision. 30 Wn. App. at 375.

The juvenile court's discretion to decline jurisdiction was first recognized by statute in Laws of 1913, ch. 160, § 12.

> If, upon investigation, it shall appear that a child has been arrested upon the charge of having committed a

crime, the court, in its discretion, may order such child to be turned over to the proper officers for trial under the provisions of the criminal code.

Codified as RCW 13.04.120, repealed by Laws of 1977, 1st Ex. Sess., ch. 291, § 81, effective July 1, 1978.

The discretion under the statute was limited by the holding of the United States Supreme Court in *Kent v. United States,* 383 U.S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045 (1966). The Court in that case set forth eight "determinative factors"[2] to be considered in determining whether to waive juvenile jurisdiction. 383 U.S. at 566–67. This court has held that the determinative factors should be considered in exercising such discretion under RCW 13.04.120. *State v. Williams,* 75 Wn.2d 604, 607, 453 P.2d 418 (1969). Furthermore, we recognized in *In re Harbert,* 85 Wn.2d 719, 724, 538 P.2d 1212 (1975) that, superimposed on the

---

[2] "The determinative factors which will be considered by the Judge in deciding whether the Juvenile Court's jurisdiction over such offenses will be waived are the following:

"1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

"2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.

"3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted.

"4. The prosecutive merit of the complaint, i. e., whether there is evidence upon which a Grand Jury may be expected to return an indictment (to be determined by consultation with the United States Attorney).

"5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime in the U. S. District Court for the District of Columbia.

"6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

"7. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this Court, or prior commitments to juvenile institutions.

"8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court." *Kent v. United States,* 383 U.S. at 566–67.

eight *Kent* criteria, is a requirement that "a waiver order must be accompanied by a statement of the reasons for the waiver order of sufficient specificity to permit meaningful review."

■ We have not yet considered whether these limitations on the juvenile court's discretion to decline continue to apply under the Juvenile Justice Act of 1977. At least one Court of Appeals decision specifically applies the limitations under the new statute. In *State v. Foltz,* 27 Wn. App. 554, 556–57, 619 P.2d 702 (1980), the court said, in considering a decline of jurisdiction under RCW 13.40.110:

> The exercise of discretion in a juvenile declination hearing is uniquely limited. First, the court must consider eight criteria promulgated in *Kent v. United States,* 383 U.S. 541, 566–67, 16 L. Ed. 2d 84, 86 S. Ct. 1045, 1060 (1966). Second, the court's exercise of discretion must be consonant with the purposes of the Juvenile Justice Act of 1977 which are, broadly, to provide for the handling of juvenile offenders through a separate and independent system providing both punishment and treatment where necessary. RCW 13.40.010(2). Third, the trial court's discretion is subject to reversal when "'the discretion has been exercised upon a ground, or to an extent, clearly untenable or manifestly unreasonable.'" *In re Harbert,* 85 Wn.2d 719, 723, 538 P.2d 1212 (1975), citing *In re Burtts,* 12 Wn. App. 564, 530 P.2d 709 (1975), citing *Friedlander v. Friedlander,* 80 Wn.2d 293, 298, 494 P.2d 208 (1972). As stated in *In re Harbert, supra* at 723–24:
>
>> Moreover, both *Kent* [*v. United States, supra*] and *Dillenburg v. Maxwell,* 70 Wn.2d 331, 413 P.2d 940, 422 P.2d 783 (1966), recognize the necessity that a waiver order must be accompanied by a statement of the reasons for the waiver order of sufficient specificity to permit meaningful review.

(Footnote omitted.) This decision is correct; there is no reason the limitations should not continue to apply under RCW 13.40.110. Indeed, the 1977 statute itself specifically limits the discretion by requiring a written finding that a decline of jurisdiction is in the best interest of the juvenile or the public. RCW 13.40.110(1)(a) and (3).

The issue before us therefore is whether the juvenile

court's decision to decline jurisdiction over defendant comports with the requirements of RCW 13.40.110(2) and (3) and with the case law summarized above.

The only "written findings" are the checked boxes in the standardized decline of jurisdiction form. Considered in isolation, these findings are inadequate, primarily because they are not sufficiently specific to permit meaningful appellate review. The boilerplate on the standard form is of necessity very general, and is not directed to the particular facts of each case. A reviewing court can find little guidance in the conclusory statement that the "protection of the community requires a decline" because the offenses were serious and were "committed in an aggressive, violent, premeditated or willful manner." If that without more were sufficient to justify a decline, then all serious crimes of violence and even serious premeditated or willful crimes against property could be diverted to adult courts without regard to the age and maturity of the offender.

The most significant flaw in the standard form is that it makes no provision for the delicate balancing of the eight *Kent v. United States* factors which must be considered in each case. This balancing function is too complex to be represented by checkmarks against one or more imprecise assertions. It is impossible for a reviewing court to determine from the standard form alone what weight, if any, the juvenile court gave to the factors which are not checked.

Moreover, these findings are considerably less detailed than the findings approved by the Court of Appeals in *State v. Jamison,* 25 Wn. App. 68, 74, 604 P.2d 1017 (1979), *aff'd,* 94 Wn.2d 663, 619 P.2d 352 (1980). In that case, the trial court in its findings carefully and specifically explained how the defendant met all the *Kent v. United States* criteria, providing the appellate court ample basis for review.

Although its written findings are inadequate, the trial court delivered a carefully reasoned oral opinion which explained more fully the decision to decline. The court considered the nature of the alleged offenses, defendant's background, his mental and emotional problems, the com-

parative rehabilitative services available in the juvenile and adult systems, and the lack of any definite prediction of successful treatment before defendant was released at age 21 from the juvenile court's jurisdiction. The record supports the conclusions reached in the oral opinion. Although the mental health experts agreed that decline of jurisdiction was not in defendant's best interests, the testimony of Mr. Fox, the juvenile court caseworker, supports the conclusion that when the defendant's interest is balanced against the interest of society, the interest of society must prevail. It is not an abuse of discretion for the trial court to agree with the caseworker on this matter.

This court has not previously considered whether findings required by RCW 13.40.110(2) may be supplemented by the juvenile court's oral opinion. In the analogous situation of a disposition outside the standard range to avoid a "manifest injustice" under RCW 13.40.160(1), the court must provide written reasons for its decision. This court has looked to the record as a whole to determine the sufficiency of those reasons. *State v. Bryan*, 93 Wn.2d 177, 606 P.2d 1228 (1980); *State v. Rhodes*, 92 Wn.2d 755, 600 P.2d 1264 (1979). Another analogy can be drawn to the review of administration hearings where written findings may be supplemented by undisputed evidence from the record. *Chmela v. Department of Motor Vehicles*, 88 Wn.2d 385, 391, 561 P.2d 1085 (1977).

We conclude, therefore, that it is appropriate in this case to look to the entire record, including the court's oral opinion, to determine the sufficiency of the court's reasons to decline jurisdiction. We are convinced, after considering the record before us, that the trial court's decision to decline jurisdiction was not improper. While the lack of written findings is not fatal in this case, we do not approve the omission. Written findings indicating that the court considered the "determinative factors" specified in *Kent v. United States*, should be entered in all instances where

juvenile jurisdiction is declined.[3]

We turn now to the second issue, whether privilege attaches to the statements made by defendant in the evaluations prior to the decline hearing. Defendant argues that these statements he made to the mental health professionals appointed by the juvenile court should not have been admitted in his trial in adult court. He makes two arguments. First, he argues that the statements are protected by the government information privilege under RCW 5.60-.060(5). Second, he argues that the statements were protected by the requirement of fundamental fairness under the Fourteenth Amendment guaranty of due process.

■ These arguments are somewhat wide of the mark. The interest at issue is not the governmental information privilege or some nebulous concept of fundamental fairness, but rather the well recognized Fifth Amendment privilege against self–incrimination. We recently held in *State v. Bonds*, 98 Wn.2d 1, 653 P.2d 1024 (1982) that the Fifth Amendment privilege applies to statements made, prior to a decline hearing, to court appointed mental health professionals.

The privilege against self–incrimination precludes the use of defendant's statements unless the privilege was knowingly and intelligently waived following a warning required by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). No such waiver was given in the present case.

■ Although the Fifth Amendment privilege was not waived by defendant, the privilege may not be asserted to prevent the State's using defendant's statements to impeach his credibility after he has taken the stand. *Harris v. New York*, 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971); *State v. Davis*, 82 Wn.2d 790, 514 P.2d 149 (1973).

In the present case, the statements made by defendant to

---

[3]This court was informed by counsel at oral argument that King County has desisted in its use of these forms and that formal findings of fact and conclusions of law are now entered after juvenile decline decisions.

mental health professionals were introduced only after defendant himself took the stand. *State v. Davis* is almost directly on point. In that case, the adult defendant Davis was questioned on the night of his arrest by a psychiatrist hired by the prosecutor. Davis was not advised of his right to counsel prior to the questioning. He took the stand and the trial court permitted the psychiatrist to testify as to inconsistent statements made by the defendant on the night of his arrest. This court said in *State v. Davis*, 82 Wn.2d at 793:

> The United States Supreme Court has held that, while a statement obtained from a defendant without advising him of his right to counsel and of his right to remain silent, and warning him that anything which he says may be used against him in a court of law, cannot be used by the prosecutor to make out his case in chief, it may be used to impeach the defendant if he takes the stand and makes statements contrary to those previously given, provided that its trustworthiness satisfies legal standards. *Harris v. New York*, 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971).

There is no evidence in the present case that defendant's statements to the mental health professionals were coerced or otherwise untrustworthy. The Fifth Amendment privilege therefore does not prevent those statements' being introduced to impeach his credibility.

The Court of Appeals is affirmed.

BRACHTENBACH, C.J., STAFFORD, UTTER, DOLLIVER, WILLIAMS, DORE, and DIMMICK, JJ., and CUNNINGHAM, J. Pro Tem., concur.

Reconsideration denied February 18, 1983.