IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Guardianship of | ) | No. 82246-2-I |
| | ) | |
| ROBERT FRANK FOSTER, | ) | |
| | ) | UNPUBLISHED OPINION |
| An alleged incapacitated person. | ) | |

BOWMAN, J. — Robert Frank Foster appeals the trial court's order finding him to be an incapacitated person and appointing a full guardian of his person and estate under chapter 11.88 RCW. Foster argues the trial court erred by failing to include written findings in its order appointing him a guardian. We agree and remand for the trial court to enter the appropriate findings.

FACTS

In February 2020, 72-year-old Foster fell and broke his hip while living alone. After a day of lying on the floor, he dragged himself out of his apartment into the hallway. A neighbor found Foster and drove him to Providence Reginal Medical Center Everett (Providence). Doctors performed hip replacement surgery and hospitalized Foster for months while he recovered. During recovery, doctors observed that Foster suffered from a neurocognitive disorder, possibly dementia, likely linked to his history of polysubstance abuse and post-traumatic stress disorder. The doctors believed that Foster's neurocognitive abilities would steadily decline over time. So Providence petitioned to establish a "full" guardianship over Foster's "person and estate."

The court appointed Foster a guardian ad litem (GAL), who reviewed his medical and psychiatric records and interviewed Foster, two of his daughters, and hospital social workers and investigators.  The GAL filed a report in June 2020 and recommended the court appoint Foster a "full guardian of his person and his estate."  Foster opposed the guardianship.

In December 2020, the trial court held a contested guardianship hearing.  At the hearing, the GAL testified that Foster had long-term substance abuse and mental health issues that led to repeat hospitalizations.  The GAL noted that in late July 2020, after Foster recovered from his hip surgery, the hospital discharged him into the care of one of his daughters.  But Foster promptly left his daughter's care and returned to his apartment alone.  About a week later, someone found Foster lying on the floor of his apartment, covered in feces.  He had been there for days.  Doctors again hospitalized Foster and then discharged him a week later.

The GAL testified that Foster visited the emergency room four times in September 2020.  In late September, doctors yet again hospitalized Foster after they found he was malnourished and unable to care for himself.  The GAL did not know how long Foster remained hospitalized that time.  Then, in October 2020, Foster once again landed in the hospital after crashing his car into the side of his apartment building.  According to the GAL, each time Foster "is released from the hospital, he doesn't last for very long without having problems and being readmitted to a hospital."

The trial court admitted into evidence a May 2020 medical report provided by the GAL and a December 2020 medical progress note provided by Foster, both relating to Foster's mental status. Those documents showed that during each hospitalization, doctors oscillated between finding Foster decisional and nondecisional as to his capacity to make medical decisions.

The GAL also testified about an Adult Protective Services (APS) investigation involving Foster's financial incapacity. A concerned bank teller reported to APS that Foster brought a woman into the bank and withdrew money to give to her. The GAL testified that between that incident and his observations of Foster in "the last nine months," Foster "just hasn't been able to manage his own affairs." The GAL believed Foster was incapacitated and maintained his recommendation that the trial court appoint a full guardian.[1]

Foster testified that he did not want a guardian but recognized that he "could use some help" with daily activities. Foster admitted that he struggled with cooking, cleaning, and checking the mail and agreed that "living in assisted living" could help him with those tasks, "[w]ithout a guardianship." But Foster could not articulate a plan to leave the hospital other than returning alone to his apartment.[2]

---

[1] When the GAL filed his report in June 2020, he recommended one of Foster's daughters serve as guardian. But after the incident in July when Foster refused to stay at the daughter's house, she decided she could no longer act in that capacity. So at the hearing, the GAL changed his recommendation to a professional guardianship service.

[2] Foster testified that he would "love to" live with his youngest daughter. But nothing in the record shows the youngest daughter agreed to or even considered this plan. Her older sister was the only guardian the GAL recommended in his report, and when she declined, he recommended a professional service.

After closing arguments but before the court ruled, the GAL notified the court that he received an e-mail from Foster's housing attorney, stating that Foster could no longer live at his apartment. The GAL guessed Foster missed the application deadline for housing assistance while hospitalized, but in any event, he "currently . . . does not have housing to go to."

The court then made oral findings. It found that "based on the testimony of the [GAL] as well as the medical report," Foster was incapacitated. Citing Foster's many hospitalizations and the "various states" in which people found him and his apartment, the court found that Foster was at a "significant risk of personal harm" and demonstrated an "inability to adequately provide . . . the essentials of life; nutrition, health, housing, and physical safety." The court also found that Foster was at a significant risk of financial harm, pointing to the bank teller's APS report. Thus, the court granted the full guardianship petition.

The next day, the court entered a written guardianship order. That order is, in large part, a standardized form. The order concludes that Foster "is incapable of managing his personal or financial affairs and is in need of a Full Guardianship of the Person and Estate." But the order lacks any factual findings on Foster's capacities, condition, or needs in support of the court's conclusion.[3]

Foster appeals.

---

[3] The order lists several standardized clauses labeled as "Findings of Fact." But these are not factual findings describing the bases for the court's conclusion, they merely describe the procedural events surrounding the hearing, such as notice requirements, jurisdiction, appointment of the GAL, the duties of the guardian, and fees and costs.

4

ANALYSIS

Foster argues the court erred by failing to include written findings supporting its determination that he is incapacitated as required by RCW 11.88.095(2)(a). Providence argues that RCW 11.88.095 does not require "only" written findings. In the alternative, it argues that when viewed together, the trial court's written and oral findings satisfy the statute's requirements. We agree with Foster.

We review issues of statutory interpretation de novo. In re Guardianship of Beecher, 130 Wn. App. 66, 70, 121 P.3d 743 (2005). We also review whether a trial court complied with statutory requirements de novo. In re Welfare of A.L.C., 8 Wn. App. 2d 864, 876, 439 P.3d 694 (2019); State v. Stone, 165 Wn. App. 796, 806, 268 P.3d 226 (2012).

When interpreting a statute, we first look to its plain language and meaning to determine legislative intent. Beecher, 130 Wn. App. at 70-71. We must interpret and construe statutes to give all the language effect, with no portion rendered meaningless or superfluous. Spokane County v. Dep't of Fish & Wildlife, 192 Wn.2d 453, 458, 430 P.3d 655 (2018). "When the plain language is unambiguous, subject to only one reasonable interpretation, our inquiry ends." Spokane County, 192 Wn.2d at 458.

Chapter 11.88 RCW empowers the superior court of each county to appoint a guardian for the person and estate of an incapacitated person. RCW 11.88.010(1). Under that chapter, the court may deem a person incapacitated as to their "person" when it determines that "the individual has a significant risk of

5

personal harm based upon a demonstrated inability to adequately provide for nutrition, health, housing, or physical safety." RCW 11.88.010(1)(a). And the court may deem a person incapacitated as to their "estate" when it determines that "the individual is at significant risk of financial harm based upon a demonstrated inability to adequately manage property or financial affairs." RCW 11.88.010(1)(b).

The legislature made clear that people with incapacities "have unique abilities and needs," and that while some people with incapacities "cannot exercise their rights or provide for their basic needs without the help of a guardian," the "liberty and autonomy" of incapacitated persons "should be restricted through the guardianship process only to the minimum extent necessary to adequately provide for their own health or safety, or to adequately manage their financial affairs." RCW 11.88.005. In that regard, RCW 11.88.095(1) requires that a court appointing a guardian must base its order on factual findings about "the capacities, condition, and needs of the alleged incapacitated person." And the statute clearly states that the "order appointing" the guardian "shall include" these findings. RCW 11.88.095(2)(a). Thus, the plain language of RCW 11.88.095(2)(a) requires written factual findings in support of a court's conclusion that a person is incapacitated.

Here, even though the trial court made oral findings after the guardianship hearing, it did not include findings on Foster's capacities, condition, or needs in its written order as required by RCW 11.88.095(2)(a). The order contains only the court's conclusion that "ROBERT F. FOSTER is incapable of managing his

personal or financial affairs and is in need of a Full Guardianship of the Person and Estate."[4]

Still, Providence argues that "there is no requirement for the trial Judge to detail every fact relied on." It is true that a trial judge need not detail every fact in a written order. See, e.g., In re Det. of LaBelle, 107 Wn.2d 196, 219, 728 P.2d 138 (1986) ("a trial court is not required to make [written] findings of fact on all matters about which there is evidence in the record; only those which establish the existence or nonexistence of determinative factual matters need be made"). But the court must at least identify a factual basis sufficient to support its legal conclusion. LaBelle, 107 Wn.2d at 218 (findings of fact should at least be sufficient to reveal the factual bases the court relied on for its ultimate conclusion). Here, the trial court's written order contains no facts in support of its legal conclusion.

Finally, citing LaBelle, 107 Wn.2d at 219; State v. Holland, 98 Wn.2d 507, 518, 656 P.2d 1056 (1983); Francis v. Department of Corrections, 178 Wn. App. 42, 52, 313 P.3d 457 (2013); and Tyler v. Grange Insurance Ass'n, 3 Wn. App. 167, 171, 473 P.2d 193 (1970), Providence urges us to look at the trial court's oral findings in the absence of written findings. But those cases do not hold that the court's oral findings can completely replace written findings. Instead, they hold only that we may look to oral findings to supplement written findings, so long

---

[4] Though the trial court's order labels this language is as a finding of fact, it is a legal conclusion about the ultimate issue, so we treat it as a conclusion of law. Inland Foundry Co. v. Dep't of Labor & Indus., 106 Wn. App. 333, 340, 24 P.3d 424 (2001) (we treat factual findings as conclusions of law if they are a determination made by a process of legal reasoning); see RCW 11.88.010 (whether a person is "incapacitated" is the ultimate issue a superior court must decide in a guardianship case); see also In re Det. of Rushton, 190 Wn. App. 358, 370, 359 P.3d 935 (2015) (we review conclusions of law, even if labeled as findings of fact, de novo).

as there is no conflict between them.  See LaBelle, 107 Wn.2d at 219 ("inadequate" written findings may be supplemented by the trial court's oral decision or statements in the record); Holland, 98 Wn.2d at 518 (our Supreme Court was "convinced" that the trial court's decision to decline juvenile jurisdiction was proper, even though the written findings were inadequate, because "the trial court delivered a carefully reasoned oral opinion which explained more fully [its] decision"); Francis, 178 Wn. App. at 52 (when written findings of fact are not clearly articulated and distinguished from conclusions of law, we may look to consistent language in the trial court's oral opinion); Tyler, 3 Wn. App. at 171 (the oral opinion of the trial court may be used to supplement the written findings of fact "where they are not inconsistent").

Providence cites no case that holds oral findings can entirely substitute statutorily required written findings.  Indeed, to do so would ignore the clear mandate of the legislature to include such findings in "[e]very order" appointing a guardian.  RCW 11.88.095(2)(a); Jongeward v. BNSF Ry. Co., 174 Wn.2d 586, 592, 278 P.3d 157 (2012) (in interpreting a statute, our fundamental objective is to determine and carry out the legislature's intent).

Because the trial court's order appointing a full guardianship of Foster's person and estate includes no written findings about Foster's capacities, condition, and needs as required by RCW 11.88.095(2)(a), we remand for the trial court to enter appropriate findings.  See Marsh v. Merrick, 28 Wn. App. 156,

160, 622 P.2d 878 (1981) (when a trial court fails to make findings required by statute, the remedy is to remand for entry of those findings).[5]

_____ Brenner, J

WE CONCUR:

_____                    _____

---

[5] Because we remand for entry of written findings, we do not reach Foster's other assignments of error.