IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Guardianship of: | ) | No. 39788-2-III |
| | ) | |
| K.P. | ) | UNPUBLISHED OPINION |
| | ) | |

MURPHY, J. — Eastern State Hospital (ESH) petitioned for a full guardianship of the person and estate of K.P. After a bench trial, the superior court found that (1) K.P. lacked the ability to meet her physical needs and manage her finances, and (2) K.P.'s needs could not be met by a protective arrangement or a limited guardianship or conservatorship. We agree and affirm.

## FACTS

K.P. was born in 1961 and carries a diagnosis of schizoaffective disorder. It was described that K.P. struggles with major mood episodes that have psychotic elements, as well as elements of paranoia, delusions, hallucinations, and aggression. Since the late 1990s, K.P. has been admitted to ESH over 20 times, with 6 admissions since 2017. ESH does not function as a permanent place to live. In recent years, ESH worked to create an effective discharge plan that would not result in K.P.'s readmission. Unfortunately, over the last few years, discharges have each resulted in a short period of time with K.P. experiencing dangers to self and endangerments to others, and

No. 39788-2-III
*In re Guardianship of K.P.*

readmission. With this historical perspective, on October 4, 2021, ESH petitioned for a full guardianship of the person and the estate of K.P.[1]

ESH alleged in the petition that K.P. "is unable to adequately provide for nutrition, health, housing, or physical safety and is at significant risk of personal harm" and "is unable to adequately manage property or financial affairs and is at significant risk of financial harm." Clerk's Papers (CP) at 1.

A bench trial on the petition was held in April 2023.

*Trial testimony*

*Josh Guthmueller*

The first witness called by ESH at trial was Josh Guthmueller, the proposed guardian and conservator. Guthmueller's brief testimony touched on his background, training, and willingness to serve if appointed.

*Dr. Brian Sweatt*

Dr. Brian Sweatt, K.P.'s treating psychiatrist, testified about K.P.'s current diagnosis: schizoaffective disorder, bipolar type treatment resistant. Dr. Sweatt described that the schizophrenia component of K.P.'s diagnosis manifests in disorganized

---

[1] Nomenclature has changed from "full guardianship of person and estate" to "guardianship/conservatorship" with enactment of the uniform guardianship, conservatorship, and other protective arrangements act, chapter 11.130 RCW, and repeal of the former guardianship statutes, chapters 11.88 and 11.92 RCW.

behaviors, along with delusional and persecutorial beliefs. He testified that people demonstrating disorganized behavior take issue with the current chronology or calendar, or may wear multiple layers of clothing or clothing inappropriate for the weather. K.P.'s "delusional beliefs or counter factual beliefs regarding the way her body operates" would often lead K.P. to being resistant to beneficial treatments or would interfere with her ability to make medical decisions that were in her best interest. Rep. of Proc. (RP) (Apr. 10, 2023) at 43. Dr. Sweatt expressed concern that K.P. was unable to make reality-based decisions about her health based on his experiences with her. For example, K.P. declined medical interventions due to her belief that the doctors were trying to steal her blood. As another example, historically, K.P. had been unable to regulate her sodium levels as a result of drinking excessive water, but she declined recommended blood draws to test her sodium levels, which may have become dangerously low. As a result, ESH engaged in "pretty stringent work" to restrict K.P.'s fluids "so that she can manage her [sodium] at a level that's consistent with her ability to think at least apparently appears to be clinically more clearly." RP (Apr. 10, 2023) at 59.

The bipolar component of K.P.'s diagnosis has a mood component in which K.P. will become easily upset and switch between happy, sad, and angry relatively quickly. To complicate matters, K.P. will complain about health issues, but follow-up is not easily accomplished because K.P. declines exams. Dr. Sweatt expressed that it has been a

struggle to assess K.P.'s reported symptoms because K.P. often requires "serious convincing" before allowing any medical intervention. RP (Apr. 10, 2023) at 48.

Late in 2022, ESH obtained a court order to administer a new antipsychotic medication that K.P. did not want to take. Dr. Sweatt did not believe K.P.'s previous medication was working, and the new medication was offered to reduce symptoms. The change in medications, which occurred only as the result of a court order, has been observed to have resulted in behavioral improvements.

Dr. Sweatt has repeatedly worked with K.P. to create discharge plans. K.P.'s history is that she discharges from ESH to a hotel of her choice, thereafter rapidly declines as a result of her choices, and readmits to psychiatric care. The recommendation of K.P.'s treatment team is discharge to "someplace where she may be able to have help with her medicines, with her food, with her shelter, where someone can check in on her." RP (Apr. 10, 2023) at 49. In the past, K.P. on discharge declined to follow the treatment team's recommendations and insisted on independent living. Dr. Sweatt noted that when he engages K.P. to discuss discharge or a possible guardianship, K.P. becomes upset and goes into a "[m]urderous rage," directing threats and physical violence toward Dr. Sweatt. RP (Apr. 10, 2023) at 56.

The opinion of Dr. Sweatt was that a guardianship would help K.P. with both her medical and financial decisions. Further, it was Dr. Sweatt's opinion that K.P.'s somatic

delusions precluded her from understanding the risks associated with declining treatment, or with actions like sending money to hotels and apartments for deposits, or to an unknown person she referred to as her "husband." RP (Apr. 10, 2023) at 53. While recognizing K.P.'s right to make her own financial choices and placing value on her independence, Dr. Sweatt opined that K.P. demonstrated a "concrete inability to accept new information incorporated into her thinking process." RP (Apr. 10, 2023) at 52. It was Dr. Sweatt's belief that a guardian could help K.P. sign necessary paperwork that she may not understand or be comfortable with, and also help in finding proper places to live on discharge, as well as assist in making decisions regarding health and safety should K.P. experience a medical emergency or require a medical intervention while in the community.

As far as medical decision making, Dr. Sweatt noted K.P.'s brother agreed with a guardianship for K.P. "because she's made threats against [their family], and they worry about if they were to make decisions for her what that would do." RP (Apr. 10, 2023) at 60.

*Leslie Miknavich*

Leslie Miknavich has been K.P.'s psychiatric social worker at ESH since August 2022. Miknavich was ESH's signing representative for the petition on a basis that K.P. needs a higher level of care after discharge in the form of assisted living with case

management, structured care in assisted living, or a group home. Miknavich testified K.P.'s paranoia, distrust of staff, and inability to make reality-based decisions resulted in K.P. being unwilling to participate in discharge planning with agencies to receive assistance in finding housing or signing up for housing vouchers. K.P. expressed the goal of living with her "husband," a person with no known address or phone number, and with whom Miknavich has never spoken. RP (Apr. 10, 2023) at 91-92. K.P. has expressed the fear that if she signed up for services, then her money would be taken, with these discussions on discharge from ESH causing K.P. to become upset and then yell and threaten staff.

Miknavich has concerns about K.P.'s handling of money. For example, K.P. would pay in advance to live in a hotel and within weeks she would be readmitted to ESH when she ran out of money. After her last two discharges, K.P. did not attend mental health outpatient services meetings, did not fill prescriptions, and was back at ESH within a few weeks. Miknavich worried this same scenario would continue should K.P. be discharged independently without proper resources in place.

It was Miknavich's opinion that a guardian could assist K.P. in signing necessary discharge paperwork, advocating for and supporting K.P. in the community, and assisting K.P. in making reality-based decisions for safety and financial choices. Miknavich testified that she had not been able to find anyone who might be an option for a less

restrictive alternative, noting K.P.'s brother was unavailable or unwilling, and who

instead expressed support for the guardianship.

*Lisa Anselmo, PhD*

Lisa Anselmo, PhD testified in her capacity as the appointed court visitor. Dr.

Anselmo testified that as part of her appointment, she met with K.P., K.P.'s family, and

members of K.P.'s care team, and produced a confidential report. Through this process,

Dr. Anselmo concluded K.P. "meets criteria to be considered incapacitated to manage

personal or financial matters." Clerk's Papers (CP) at 80. Dr. Anselmo recommended

the court order a full guardianship and full conservatorship to manage K.P.'s health and

financial affairs. Dr. Anselmo based her recommendation for full guardianship on

K.P.'s "long established history of having difficulty making reality-based decisions," as

well as the potential for the guardian to serve as a "focal point" to develop K.P.'s skills.

RP (Apr. 10, 2023) at 137. Dr. Anselmo believed a full conservatorship was necessary to

assist K.P. in making "reality-based, appropriate financial decisions" because K.P.'s past

spending habits showed K.P. spent money without the ability to plan for her future.

RP (Apr. 10, 2023) at 138.

In Dr. Anselmo's opinion, no suitable less restrictive alternative was available

based on K.P.'s "history, diagnosis and prognosis," nor could any alternative offer the

benefits a full guardianship or full conservatorship could provide. Dr. Anselmo spoke

with K.P.'s brother and sister, who both stated their inability to assist. She did not find K.P. had any other family members, friends, or anyone else willing to serve in a less restrictive alternative arrangement.

*Joy Gilbert*

Next, Joy Gilbert, an occupational therapist at ESH, testified about the evaluation of K.P.'s cognitive functioning, and the opinion that independent living or even highly supported independent living for K.P. was not recommended. According to Gilbert, K.P. did not take well to direction or advice and would instead become frustrated and impulsive. Further, K.P. demonstrated an inability to process multistep directions. In Gilbert's opinion, "the biggest crux for [K.P.] is that at that point where she could use assistance, she often does not want assistance and becomes too upset to really take in the assistance and that she becomes more frustrated that things aren't working." RP (Apr. 10, 2023) at 119. Gilbert opined that a guardian would be in K.P.'s best interest, as it would "really take that element of poor planning, poor organization and impulsivity" out of the decision-making mix. RP (Apr. 10, 2023) at 121.

*Carrie Schrock-Hall*

Carrie Schrock-Hall, a public benefits specialist who works with patients at ESH to complete applications for Medicaid and other benefits, testified that she worked with K.P. for seven years. She believed K.P. knew how to contact her for help, and K.P. had

indeed done so in the past, but at other times, K.P. resisted any assistance. While admitted at ESH, K.P.'s Medicaid and food benefits were suspended such that K.P. would have to reapply for benefits prior to discharge, but whether K.P. was willing to reapply "[d]epends on the day." RP (Apr. 11, 2023) at 148. Without Medicaid, K.P. would have to privately pay for housing.

### Russell Nelson

K.P.'s brother, Russell Nelson, acts as trustee of K.P.'s special needs trust, which covers expenses not covered by insurance. Nelson testified that, overall, K.P. was good with managing her money but would run out of funds to cover her hotel stays and would not then have a place to live. While K.P. could initially take care of herself after discharge, K.P. would deteriorate over time and be readmitted to ESH. Nelson believed K.P. could retain some control over her money, but she could use assistance from a third party.

### Sophie Flores

Sophie Flores, the manager of a self-storage facility where K.P. rents storage lockers, testified that she has known K.P. in a business capacity since approximately 2017, and testified that K.P. pays her rent, sometimes ahead of schedule.

9

*K.P.*

K.P. testified on her own behalf. K.P. testified she has been good at managing her money having both a bank account and a special needs trust to which she contributes, and that she gives her significant other "very minimal" amounts of money and does not otherwise give money away. RP (Apr. 11, 2023) at 167. K.P. believes she also has a good record of managing her life other than when she has been admitted to ESH. K.P. testified she ends up back at ESH "usually for an intervention from a very disgruntled family member or somebody else that wants to get even with me" or because "they're not receiving as much" money and are "very jealous." RP (Apr. 11, 2023) at 173. K.P. acknowledged "there's something wrong" with her life management but believed she could reconstruct her life with minimal interference. K.P. testified she "won't accept anything but independence." RP (Apr. 11, 2023) at 200.

*Trial court ruling*

The trial court granted ESH's petition and ordered a full guardianship and full conservatorship for K.P. After reviewing the testimony heard at trial, the trial court gave the following oral ruling:

> Based on the above testimony and looking at what the statute requires, the Court does find by clear and convincing evidence that [K.P.] does lack the ability to meet her essential requirements for physical health as exampled with the over drinking of water and causing sodium issues and your own self-care believing you don't need medications and you're unable

to receive and evaluate information that would help you use supportive services or assistance.

You clearly need to try and avoid a 23rd admission back to Eastern State Hospital, and this is not a long-term hospital for life. This is a place to get you better and get you back out.

The Court does find that it's necessary to prevent significant risk of harm to your health, safety and self-care, and it's clear your needs cannot be met with a less protective arrangement instead of a full guardianship and conservatorship.

The Court believes those 21 prior discharges were attempts by the hospital to work with you and show that you couldn't live in independent living. They give you those chances, but those failed, and you returned to Eastern State Hospital again.

A conservator is necessary to work with you and your providers to find permanent, stable housing and to take advantage of all those wraparound services that are out there in the community.

A guardian would be able to sign the necessary paperwork to find a place that will allow you to discharge from the hospital and be more permanent.

The Court finds that it would be necessary to prevent that significant risk of harm. [K.P.]'s identified needs cannot be met with any other protective arrangement. The Court is granting the petition and appointing a guardian and a conservator to handle all your financial affairs. This would include, though, keeping your storage lockers until you can find stable housing so you can keep your items that are very precious to you.

The Court finds that I know that you're not happy about this, but the Court does believe it's in your best interest and to keep you safe and to get you on the path to getting out of the hospital and successful in the community.

RP (Apr. 20, 2023) at 229-30.

A hearing was held May 19, 2023, for entry of findings of fact and conclusions of law, and an order appointing a full guardian and full conservator, with final paperwork signed and filed May 23, 2023. The trial court's written findings of fact included the following as the basis for the guardianship and conservatorship:

The Respondent, [K.P.], by clear and convincing evidence:
[1] lacks the ability to meet essential requirements for physical health, safety or self-care because the Respondent is unable to receive and evaluate information or make or communicate decisions, even with appropriate supportive services, technological assistance, or supported decision making. [K.P.] has a behavioral health disorder. Her diagnosis is Schizoaffective Disorder. [K.P.] has symptoms of both schizophrenia and a mood disorder where she can go from calm to manic very quickly. [K.P.]'s symptoms of her disorder are she can be delusional, paranoid and she can be aggressive. The symptoms of her mental disorder create a situation where she cannot make reality-based decisions. Instead, she makes decisions based on her delusions and paranoia. These decisions result in an inability to care for her health, safety and physical needs. For example [K.P.] is on a water restriction due to over drinking water. This can cause significant health concerns and even death. [K.P.]'s sodium levels must be evaluated to ensure she is not over drinking. [K.P.] often will not consent to labs based upon delusions that the doctors are trying to harm her in some way or steal her blood.

[2] is incapable of managing property or financial affairs due to a limitation in Respondent's ability to receive and evaluate information. An appointment of a conservator is necessary to [X] avoid significant dissipation of the individual's property. See finding of fact above. Additionally, [K.P.] has access to a checking account. She will not inform anyone which bank or how much money is in the account. [K.P.] has been victimized in the past overpaying for services such as transportation and housing. (taxi rides and hotels) [K.P.] will pay ahead for a hotel before she is ready for discharge, believing she will be leaving the hospital despite being subject to

court ordered detention. [K.P.] writes checks to a person she calls
her significant other. She will not share why she [sic] writing these
checks or the amount or why her significant other needs the money.
Eastern State Hospital personal has not been able to confirm who
this person is or what his relationship is to [K.P.]. [K.P.] does have
some skills and abilities. For example, [K.P.] has however
maintained storage units (trunks) since 2017 paying timely and
sometimes a couple of months in advance. But, despite this [K.P.]
requires a conservator to protect her assets so that she is not
victimized again. [K.P.] is in need of a full guardianship and
conservatorship.

[3] There is clear and convincing evidence that the Respondent's needs
cannot be met by a protective arrangement instead of a guardianship
and/or conservatorship or other less restrictive alternative, including
the use of appropriate supportive services, technological assistance,
or supported decision making. [K.P.] did not make other
arrangements such as a power of attorney and the petitioner was
unable to find anyone who would be the power of attorney for
[K.P.].

[4] There is clear and convincing evidence the Respondent's needs
cannot be met by limited guardianship and/or conservatorship. The
guardianship and/or conservatorship is appropriate.

CP at 89-90.

K.P. appeals.

ANALYSIS

On appeal, K.P. assigns error to the trial court's order of a full guardianship and

full conservatorship to the exclusion of less restrictive arrangements or alternatives.

Based on the findings as written, K.P. questions whether the trial court gave meaningful

consideration to less restrictive alternatives, faulting the written findings. K.P. assigns

13

error to the trial court's finding that K.P. "'is unable to receive and evaluate information' and 'cannot make reality-based decisions' and instead 'makes decisions based on . . . delusions and paranoia.'" Br. of Appellant at 2 (quoting CP at 89). K.P. also assigns error to the trial court finding that she "'is incapable of managing property or financial affairs due to a limitation in [her] ability to receive and evaluate information,' that 'appointment of a conservator is necessary to . . . avoid a significant dissipation of [her] property,' that [she] 'requires a conservator to protect her assets such that she is not victimized again,' and that [she] requires [a] 'full guardianship and conservatorship.'" Br. of Appellant at 2-3 (some alterations in original) (quoting CP at 89).

To appoint a guardian for an adult, a trial court must find the following by clear and convincing evidence:

> (i) The respondent lacks the ability to meet essential requirements for physical health, safety, or self-care because the respondent is unable to receive and evaluate information or make or communicate decisions, even with appropriate supportive services, technological assistance, or supported decision making;
> (ii) Appointment is necessary to prevent significant risk of harm to the adult respondent's physical health, safety, or self-care; and
> (iii) The respondent's identified needs cannot be met by a protective arrangement instead of guardianship or other less restrictive alternative.

RCW 11.130.265(1)(a). Notably, "[t]he court may not establish a full guardianship if a limited guardianship, protective arrangement instead of guardianship, or other less restrictive alternative would meet the needs of the respondent." RCW 11.130.265(2).

14

A court's order appointing a guardian must include:

> a specific finding that clear and convincing evidence established that the identified needs of the respondent cannot be met by a protective arrangement instead of guardianship or other less restrictive alternative, including use of appropriate supportive services, technological assistance, or supported decision making.

RCW 11.130.310(1)(a). An order establishing a full guardianship "must state the basis for granting a full guardianship and include specific findings that support the conclusion that a limited guardianship would not meet the functional needs of the adult subject to guardianship." RCW 11.130.310(3).

To appoint a conservator for an adult, a trial court must find all of the following by clear and convincing evidence:

> (a) The adult is unable to manage property or financial affairs because:
> (i) Of a limitation in the adult's ability to receive and evaluate information or make or communicate decisions, even with the use of appropriate supportive services, technological assistance, or supported decision making; . . .
> . . . .
> (b) Appointment is necessary to:
> (i) Avoid harm to the adult or significant dissipation of the property of the adult; or
> (ii) Obtain or provide funds or other property needed for the support, care, education, health, or welfare of the adult or of an individual entitled to the adult's support; and
> (c) The adult's identified needs cannot be met by a protective arrangement instead of conservatorship or other less restrictive alternatives.

RCW 11.130.360(2). A determination by the trial court that a basis exists for the appointment of a conservator "must be based on demonstrated management insufficiencies over time in the area of property or financial affairs." RCW 11.130.360(4). As with a guardianship, "[t]he court may not establish a full conservatorship if a limited conservatorship, protective arrangement instead of conservatorship, or other less restrictive alternative would meet the needs of the respondent." RCW 11.130.360(3).

An order establishing a full conservatorship must "state the basis for granting a full conservatorship and include specific findings to support the conclusion that a limited conservatorship would not meet the functional needs of the adult." RCW 11.130.420(4). A court's order appointing a conservator must include

> a specific finding that clear and convincing evidence has established that the identified needs of the respondent cannot be met by a protective arrangement instead of conservatorship or other less restrictive alternatives, including use of appropriate supportive services, technological assistance, or supported decision making.

RCW 11.130.420(3)(a).

When adopting the uniform guardianship, conservatorship, and other protective arrangements act, chapter 11.130 RCW, our legislature recognized that some people with incapacities "cannot exercise their rights or provide for their basic needs without the help of a guardian." RCW 11.130.001. The legislature further recognized that an incapacitated

person's "liberty and autonomy should be restricted through guardianship, conservatorship, . . . and other protective arrangements only to the minimum extent necessary to adequately provide for their own health or safety, or to adequately manage their financial affairs." RCW 11.130.001.

A "less restrictive alternative" is defined as

> an approach to meeting an individual's needs which restricts fewer rights of the individual than would the appointment of a guardian or conservator. The term includes supported decision making, appropriate technological assistance, appointment of a representative payee, and appointment of an agent by the individual, including appointment under a power of attorney for health care or power of attorney for finances.

RCW 11.130.010(15).

The Washington Supreme Court described what a written order must contain when a statute mandates factual findings:

> Generally, where findings are required, they must be sufficiently specific to permit meaningful review. *State v. Holland*, 98 Wn.2d 507, 517, 656 P.2d 1056 (1983). While the degree of particularity required in findings of fact depends on the circumstances of the particular case, they should at least be sufficient to indicate the factual bases for the ultimate conclusions. *Groff v. Department of Labor & Industries*, 65 Wn.2d 35, 40, 395 P.2d 633 (1964); *State v. Russell*, 68 Wn.2d 748, 415 P.2d 503 (1966).

*In re Det. of LaBelle*, 107 Wn.2d 196, 218, 728 P.2d 138 (1986). When written findings are not sufficient on their face, they "may be supplemented by the trial court's oral decision or statements in the record." *Id.* at 219.

The "Findings of Fact and Conclusions of Law Regarding Petition for Guardianship and Conservatorship" entered by the trial court here included findings sufficiently specific to permit meaningful review and were drafted with a degree of particularity that was required given the circumstances to understand the factual bases for the ultimate conclusions. CP at 87-90 (some capitalization omitted). In its findings of fact and conclusions of law, the trial court had four separate paragraphs under the heading "Basis for guardianship and/or conservatorship" that described specific instances and examples of why a full guardianship and full conservatorship were necessary and that K.P.'s needs could not be met through a protective arrangement or limited guardianship or conservatorship. CP at 89-90. Further, the findings of fact and conclusions of law offered additional facts and examples of evidence that were considered in support of the ultimate finding that clear and convincing evidence supported the conclusion that K.P. lacked the ability to meet her physical health needs and manage her finances, and that there was no viable less restrictive alterative to full guardianship and full conservatorship.

The burden of proof in guardianships and conservatorships is clear and convincing evidence. RCW 11.130.265(1)(a), .360(2). "We review a trial court's decision after a bench trial to determine whether the findings of fact are supported by substantial evidence . . . ." *In re Guardianship of T.H.*, 15 Wn. App. 2d 495, 501, 475 P.3d 1045 (2020). "'Substantial evidence' is the quantum of evidence sufficient to persuade a fair-

minded person of the truth of the declared premise." *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015). When the substantial evidence standard has been met, "a reviewing court will not substitute its judgment for that of the trial court even though it might have resolved a factual dispute differently." *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003). Decisions on witness credibility, conflicting testimony, and persuasiveness of the evidence are deferred to the trial court's decision making. *In re Guardianship of Ursich*, 10 Wn. App. 2d 263, 271, 448 P.3d 112 (2019).

Substantial evidence supports the trial court's decision here appointing a full guardian and full conservator. Substantial evidence also supports the trial court's determination that a protective arrangement or limited guardianship or conservatorship could not meet the needs of K.P.

The trial court identified in its findings of fact the factors that resulted in the determination that K.P. is unable to receive and evaluate information or make or communicate decisions. It also identified K.P.'s diagnoses with explanations of how those conditions manifest, as well as specific and particularized examples from lived experiences in K.P.'s history to support its conclusions. Uncontroverted testimony from K.P.'s treating psychiatrist, social worker, occupational therapist, and the appointed court visitor, demonstrated through evidence of lived examples that K.P.'s medical conditions

impede her ability to meet essential requirements for physical health, safety, and self-care, and impede her ability to manage property or financial affairs. Further, substantial evidence supports the findings that less restrictive alternatives are not viable options for reasons why a full guardianship and full conservatorship are necessary and because no family or friend is willing to serve.

## CONCLUSION

We affirm the trial court's order appointing a full guardian and full conservator for K.P.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Murphy, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Staab, J.